[No. 16623.  *En Banc.*  January 16, 1923.]

## The Pacific Car & Foundry Company, *Respondent*, v. Northern Pacific Railway Company *et al., Respondents*, Director General of Railroads *et al., Defendants,* Great Northern Railway Company *et al., Appellants.*[1]

Carriers (41)—Loss of Goods—Liability of Connecting Carrier. A connecting carrier which received from the initial carrier a shipment of steel rails and allowed them to be loaded on a steamer for export, without reference to the bill of lading and draft attached, is liable to the shipper for conversion, notwithstanding it had no notice of the outstanding bill and draft, and acted on the orders and as agent for the initial carrier, which was also liable for the conversion.

Trover and Conversion (14)—Persons Liable—Agents. The fact of agency for one primarily liable for a conversion, does not relieve the agent from liability for an act of wrongful conversion done by direction of the principal.

Carriers (43)—Liability of Initial Carrier—Negligence. An initial carrier is guilty of negligence and primarily liable for the loss of a shipment of steel rails, where it knew the same were intended for immediate export on a certain ship, and, without giving notice of a bill of lading and draft attached or the name of the consignee, delivered the same to the connecting carrier with directions to deliver at the dock for shipment, resulting in a conversion for which the connecting carrier was secondarily liable.

Same (41)—Delivery to Succeeding Carrier—Liability of Innocent Carrier. Where an initial carrier of a shipment of steel rails intended for export, with bill of lading and draft attached, requiring delivery to the order of the shipper, was guilty of conversion through delivery of the goods to the ship, the steamship company, receiving, loading and exporting the rails under the belief that it belonged to another than the true owner is an innocent sufferer through the failure of the initial carrier to give notice of the bill and draft or the name of the consignee, and is not liable to the shipper for loss of the goods.

Appeal from a judgment of the superior court for King county, Hall, J., entered February 18, 1921, in

[1]Reported in 212 Pac. 159.

favor of the plaintiff, in an action for conversion, tried to the court. Reversed, except as to respondent Pacific Car & Foundry Company.

*Thomas Balmer* and *Edwin C. Matthias,* for appellant Great Northern Railway Company.

*Oliver C. McGilvra,* for appellant Nippon Yusen Kabushiki Kaisha.

*Ballinger, Battle, Hulbert & Shorts,* for respondent Pacific Car & Foundry Company.

*C. H. Winders,* for respondent Northern Pacific Railway Company.

FULLERTON, J.—This is an action by the Pacific Car & Foundry Company to recover the value of a car load of relaying steel rails consigned by it to the defendant Northern Pacific Railway Company for carriage from Renton, in King county, to the Great Northern Dock at Seattle. As originally instituted, the action was alone against the Northern Pacific Railway Company. After the answer of that company had been filed, the plaintiff amended its complaint, made the Great Northern Railway Company a defendant, and demanded a joint and several judgment against them. On its appearing in the action, the Great Northern Railway Company caused to be brought in and made defendants the Nippon Yusen Kabushiki Kaisha (Japan Mail Steamship Company), a corporation operating a steamship line between Seattle and Japan, also one T. Takiguchi, doing business as T. Takiguchi Company, and one H. D. Porter. To the amended complaint, all of the defendants except Porter filed answers, on which the plaintiff joined issue in so far as it was adversely affected by them. The defendants also cross-complained as between themselves, raising issues in which the plaintiff was not affected, but since

no. question depends upon the form or nature of the pleadings as pleadings, their contents need not be particularly noticed. A trial was had before the court sitting without a jury. Findings of fact and conclusions of law were made to the effect that the plaintiff was entitled to a judgment against the railroad companies for the value of the steel rails, with damages in the way of interest, and that the railway companies were entitled to judgment over against the Nippon Yusen Kabushiki Kaisha. Judgment was entered accordingly, from which the Great Northern Railway Company and the Nippon Yusen Kabushiki Kaisha appeal.

The principal facts are not in dispute. In the early part of November, 1917, the defendant Porter contracted to purchase from the plaintiff, at a stated price, the steel rails in question; the contract requiring the delivery of the rails at the Great Northern Dock, in the city of Seattle. On November, 1917, the plaintiff delivered the rails to the Northern Pacific Railway Company for carriage to the place designated, taking from the railway company a straight or non-negotiable bill of lading, in which the plaintiff was named as both consignor and consignee; taking from it also a certificate of weights. Porter had not paid for the rails, and this method of consigning them was adopted by the plaintiff to insure payment before delivery to Porter. On receiving the bill of lading, the plaintiff attached thereto a draft against Porter for the amount of the purchase price, and forwarded the same to a bank in the city of Seattle, notifying Porter of its action. It also sent to Porter a copy of the railway company's certificate of weights. After Porter had contracted to purchase the rails from the plaintiff, he contracted to sell them to the defendant Takiguchi, who is an exporter, at an advance over the original cost to him.

On receiving the certificate of weights, he turned it over to Takiguchi, knowing that he intended the rails for export and knowing that the certificate was necessary in making a declaration of export. Takiguchi thereafter made arrangements for exporting the rails on the Nippon Yusen Kabushiki Kaisha's steamer Fushimi Maru, and thereupon paid Porter the agreed purchase price. Takiguchi was not told of the outstanding bill of lading and draft, and dealt with Porter on the assumption that he was the owner and consignee of the rails.

The railway lines of the Northern Pacific Railway Company do not reach the Great Northern dock. Their nearest approach thereto is at its station in Seattle. known as Interbay, which is about one-half mile distant from the dock. Freight coming in over its lines consigned to the dock is transferred at this point to the lines of the Great Northern Railway Company and by that company carried to the dock. On receiving this shipment, the Northern Pacific Railway Company carried it in a single car to its station at Interbay. It did not, however, immediately deliver the car, or tender it for delivery, to the Great Northern Railway Company. The dock named was the property of the Great Northern Railway Company. At that place it received freight intended for export only. Owing to the war conditions then prevailing, there was a congestion of freight for export on the dock, and the Great Northern Railway Company had notified the Northern Pacific Railway Company that it would receive no freight coming in on the latter's lines destined for the dock except when delivered upon its express order. When this car reached the Interbay station, it was therefore held awaiting such an order. To facilitate operations, the Northern Pacific Railway Company

maintained a clerk at the dock to transmit these orders.

At the time of this shipment, the practice of the steamship company was to give to the Great Northern Railway Company cargo lists of shipments intended for export on a particular boat, and that company would assemble the freight prior to the arrival of the boat. It sometimes happened, as it happened in the present instance, that, after the delivery of the first general cargo list, additional lists would be made out and handed to the company. If the freight desired was in a car then in the possession of the Northern Pacific Railway Company, an order would be made out, called an order for switching, containing the car initials, the car number, and the contents of the car, and delivered to the company's clerk at the dock. This person would communicate the order to the company's agent at Interbay, who would cause the car to be placed on the Great Northern Railway Company's intersecting tracks. This practice was followed in the present instance.

After Takiguchi had reserved space for the rails on the steamer Fushimi Maru, the agent of the steamship company requested the car from the Great Northern Railway Company. That company, in turn, filled out a switching order and delivered it to the Northern Pacific Railway Company's clerk at the dock, who in turn telephoned the order to the company's agent at Interbay. This order bore on its face the name of the steamship on which the rails were to be exported. The agent at Interbay delivered the car to the Great Northern tracks, who transported it to the dock, where the rails were taken from the car onto the steamship and transported on Takiguchi's order to Japan.

At the time of the delivery of the car to the Great Northern Railway Company, the agent of the Northern Pacific Railway Company did not inform the former

company of the outstanding bill of lading, nor did he give the company the name of the consignee, nor was the Great Northern Railway Company otherwise advised of these facts.  In fact, the agents of the Northern Pacific Railway Company at Interbay did not know anything concerning the ownership of the freight, nor did they know the original destination of the car further than the car cards which were fastened to the sides of the car showed its destination.  The waybill, which would and did contain the information, had not then reached Interbay, and did not arrive until some days after the rails had been loaded onto the steamer and the steamer had sailed.

Noticing, first, the appeal of the Great Northern Railway Company, we cannot subscribe to its contention that it was not liable to the plaintiff as for a conversion of the property.  While the Northern Pacific Railway Company was guilty of negligence in surrendering the property without designating the consignee, or giving notice of the outstanding bill of lading, yet it is no defense to a charge of conversion for the appellant to say that it acted as the agent of that company and followed its directions in so far as they were given. That company was itself a wrongdoer and could not authorize the delivery of the goods to anyone except the true owner, and could not authorize the appellant so to do.  The authorities cited by the appellant to maintain the judgment over against the Nippon Yusen Kabushiki Kaisha sustain this principle.  In Bowers on Conversion, § 54, it is said:

"An agent who for his principal wrongfully takes, detains or sells the goods of another is personally liable in replevin, trover or other action for the tort, even though he acted in good faith, supposing the goods to be his principal's, and although he has delivered the goods to his principal.  The fact that the agent

acted in good faith supposing that his principal had a right to have done what was done is no defense. He who intermeddles with the property not his own must see to it that he is protected by the authority of one who is himself, by ownership or otherwise, clothed with the authority he attempts to confer. And the agent cannot plead in defense that he acted under the direction of his principal, or that he derived no personal advantage from the wrong done, or that he intended no wrong; for the gist of conversion is the depriving the owner of his property and it is said that in the act of doing this the principal is a wrong-doer and the agent is a wrong-doer also."

So in Mechem on Agency (2d ed.), § 1455, it is said:

"It is in general true that every person who does an act which invades or violates the right of property or security of another, does so at the peril of being able to furnish legal justification for his act if he be called upon legally to account for it. Such a justification cannot be found either in the general or the specific command or direction of one who had no legal right to command or direct that the act be done. It is therefore the general rule that an agent who trespasses upon the person or property of another is liable to the person so injured and the fact of his agency furnishes no excuse."

These principles therefore justify the joint and several judgment entered in favor of the plaintiff against the railroad companies, and would have justified a judgment in favor of the plaintiff against the Nippon company, as well as the other defendants; but since the plaintiff is not complaining, there needs no modification of the judgment in this respect.

A further question is whether this appellant is, as between itself and the Northern Pacific Railway Company, primarily or secondarily liable. It is our opinion that its liability is secondary. By its contract with the plaintiff, the Northern Pacific Railway Company

undertook to safely carry the property intrusted to it from the place at which it received it to its point of destination and there deliver it over to the plaintiff, or to some person whom the plaintiff should authorize to receive it. This was not only the obligation enjoined upon it by statute (Rem. Comp. Stat., § 10491), but was its obligation under the common law. In the performance of this duty, since its own lines did not reach the place to which the goods were consigned, it was obliged to make use of an intermediate agency. It chose the appellant as that agency, and the appellant as the receiving carrier was bound only, as between itself and the Northern Pacific Railway Company, to deliver according to the directions given it by that company.

That the appellant fully complied with these directions, and fully complied with its legal duty in the premises, we think, contrary to the contention of the respondent railway company, the record leaves but little doubt. The respondent knew, or was bound to know, that goods transferred to this particular dock were intended for export, and knew from the notice it had of the congested condition of the dock that exportation would take place immediately. It knew, moreover, that carriers of freight by sea, as well as carriers of freight by land, carry such freight only upon the order of some one, and, in consequence, knew that some one had assumed authority to direct the exportation of this particular freight. Since it alone knew who had the rightful authority to give these directions, it was its duty to notify the appellant of this fact when it turned over to it the car in which the freight was contained. Failing in this, it was negligent, and it cannot visit the loss caused by such negligence upon the appellant.

It is generally held by the authorities that it is the duty of the initial carrier to notify the connecting carrier of any facts with reference to the destination of the goods, the method of transportation, and the like, which are essential to enable the connecting carrier properly to transport and deliver the goods. In 10 C. J. 537, the rule is laid down in the following language:

"It is the duty of the carrier to notify the connecting carrier of any facts with reference to the destination of the goods, the method of transportation, etc., which are essential to enable the connecting carrier properly to receive and transport the goods, and its liability for loss continues until it has given such shipping instructions, notwithstanding delivery to the connecting carrier. Furthermore, exemption in the contract of carriage for loss or damage beyond the line of the initial carrier will not relieve it, where such damage is brought about by its own negligent misdirection."

So in Hutchinson on Carriers (3d ed.), § 140, it is said:

"If the first carrier receives the goods from the owner with instructions or directions as to their ultimate delivery or disposition, or relative to their safe and seasonable delivery at destination, it is his duty as the forwarding agent of the owner to see that such instructions are given to the succeeding carrier to whom he delivers the goods for further transportation. Thus if the first carrier directs the goods to a destination other than the one requested by the owner, and in consequence the shipment is delayed, he will be liable although he has provided in his contract that he will assume no liability for loss or damage beyond the terminus of his own line. So if he misdirects the goods, and they are forwarded to a wrong destination and thereby lost, or if, without sufficient cause, he selects an unusual or circuitous route whereby the freight charges are greater than they would have been

had he selected the ordinary and more direct route, he, and not the succeeding carrier will be responsible. And under such circumstances, the connecting carrier is not required to delay the reception or forwarding of the goods until he can ascertain whether or not the owner and the first carrier have stipulated the terms of shipment, and if so, what those terms are and whether the preceding carrier has complied with them; or, if no terms are stipulated, whether the preceding carrier has in all things faithfully and honestly discharged his duty as the owner's forwarding agent.''

It follows, as a necessary corollary of the rule, that where such directions are given, and the connecting carrier delivers according to the directions, it complies with its duty in so far as it affects the initial carrier.

The trial court rested its conclusion that the appellant was primarily liable for the loss of the property for the reason,

''that said Northern Pacific Railway Company gave no orders or directions to the Great Northern Railway Company to deliver said car to other than the rightful consignee, and that it was the duty of said Great Northern Railway Company, upon taking delivery of said car, either to ascertain the name of the proper consignee or to refuse to take delivery thereof as between the Northern Pacific Company and itself.''

But we think this a wholly unjustifiable deduction from the record and the legal principle applicable. Had there been an utter barrenness of direction, no doubt it would have been the duty of the appellant to make inquiries as to whom the freight was consigned and to make delivery only to such consignee or upon his order. But, as we have attempted to show, there was not a barrenness of direction. There was a direction to deliver the freight at a particular place and to a particular vessel, which the appellant had the right to assume was rightful. It communicated all the informa-

tion it had to the respondent, and that company turned over the freight to it without further direction. Since, as we have said, the latter company knew the rightful consignee and the appellant did not so know, and since it did not make known to the appellant such consignee, the appellant could rightfully deliver according to the general direction; it owed the respondent no duty to institute an independent inquiry. These being the rights of the parties, they could be changed only by an express agreement, or by some custom having the force of an express agreement. Of an express agreement there is nothing at all in the record; and as to an agreement arising from custom, the evidence falls far short of establishing it.

The appeal of the Nippon Yusen Kabushiki Kaisha needs no extended consideration. It received the property under the belief that it belonged to another than the true owner and took possession of it and carried it to a foreign port on the faith of that belief. This it was led to do because of the failure of the initial carrier, who alone knew the true owner and on whom the law imposed the duty to make known such owner, to comply with that duty. It is therefore an innocent sufferer by the neglect of the initial carrier, and as between it and such carrier, is not liable to answer.

The judgment is reversed on both appeals, and remanded with instruction to dismiss as to the Nippon Yusen Kabushiki Kaisha, and to allow the Great Northern Railway Company to recover over as against the Northern Pacific Railway Company for any sum it is required to pay in satisfaction of the plaintiff's judgment.

TOLMAN, MACKINTOSH, BRIDGES, MITCHELL, and PARKER, JJ., concur.