SCHAEFER, INC. v. MINNEAPOLIS, NORTHFIELD &
SOUTHERN RAILWAY COMPANY AND OTHERS.
CHICAGO, ROCK ISLAND & PACIFIC RAILROAD COMPANY,
APPELLANT.

94 N. W. (2d) 551.

January 30, 1959—No. 37,528.

*Sullivan, Stringer, Donnelly & Sharood* and *Henry H. Cowie, Jr.,* for appellant.

*Eugene A. O'Brien,* for plaintiff-respondent.

*Frank Claybourne* and *Doherty, Rumble & Butler,* for respondent New York Central System.

KNUTSON, JUSTICE.

This is an appeal from an order of the trial court denying defendant Chicago, Rock Island and Pacific Railroad Company's motion for amended findings of fact, conclusions of law, and order for judgment or, in the alternative, for a new trial.

Plaintiff is a Minnesota corporation engaged in the manufacture of low-temperature refrigeration equipment or freezers in Minneapolis. Some of the freezers manufactured by plaintiff are sold as its own product under its own trade name, while others are manufactured for concerns who resell to dealers under their trade names. The latter type of undertaking is referred to as "private label" manufacture.

In the latter part of 1951 or early part of 1952, plaintiff entered into an agreement with Freshmaster Corporation of New York (referred to hereinafter as Freshmaster) to manufacture for it 7,200 home freezers bearing Freshmaster's label. These freezers were to be manufactured on Freshmaster's order and shipped to its customers in various parts of the country. At or about the time of the original agreement, representatives of all defendants were called to the office of plaintiff and were informed that they would share in the rail shipments and that, while the freezers would be shipped in Freshmaster's name, plaintiff was the actual shipper.

Freshmaster's credit rating was such that plaintiff was unwilling at the start to ship on open account. Originally, an arrangement was entered into under which freezers were shipped to warehouses in different parts of the country and released on order of Freshmaster as they were paid for. Plaintiff's selling price then was transmitted directly by the warehouse to plaintiff. By this method plaintiff was assured payment for each freezer as it was released from the warehouse. This plan was abandoned sometime prior to the time of the shipment here involved. Plaintiff and Freshmaster then established a bank account in Northwestern National Bank of Minneapolis in the name of Freshmaster, over which plaintiff had exclusive control. Freezers were thereafter shipped to customers of Freshmaster on its order under an order bill of lading with sight draft attached. The bill of lading and sight draft then would be sent for collection by the Minneapolis bank to a bank at the destination of the shipment, and, upon payment of the draft, the bill of lading would be released to the purchaser designated by Freshmaster and the goods then turned over to it by the carrier. The money obtained by payment of the sight draft then was transmitted by the collecting bank of Northwestern National Bank of Minneapolis and credited to this account. The amount so transmitted included not

only plaintiff's selling price to Freshmaster but Freshmaster's profit upon the resale of the freezer to its customer. Withdrawals were made from this account by plaintiff to pay it for the shipment, and the excess, constituting Freshmaster's profit on the deal, was to be accumulated in the account to pay plaintiff for other charges which might occur as a result of the entire transaction.

On April 21, 1952, Freshmaster directed plaintiff to ship a carload of freezers under its name to Peerless Appliance at Rochester, New York. Accordingly, a carload of 40 freezers having a total value, including Freshmaster's profit on the deal, of $11,743 was shipped via Minneapolis, Northfield and Southern Railway Company (referred to hereinafter as Northfield Railway) on April 21, traveling on an order bill of lading issued by that carrier, consigned from Freshmaster in Minneapolis to Peerless Appliance, Rochester, New York. On order of Freshmaster, the destination of the shipment was changed after it had gone forward. It was then in the possession of defendant Chicago, Rock Island and Pacific Railway Company (referred to hereinafter as Rock Island). On April 22, 1952, plaintiff contacted a representative of Rock Island and presented him with a new order bill of lading which changed the destination of the car to "ORDER Freshmaster Corporation * * * Notify Clinton Builders Supply Corp. * * * Syracuse * * * New York." The new bill of lading was signed by the Rock Island representative, and the original bill of lading issued by the original carrier was retired. The car was intercepted at Manly, Iowa, and there diverted to its new destination. Further details as to the manner in which this diversion was handled will be discussed hereinafter in determining the liability of the carriers inter se. When the car reached Syracuse, New York, it was in the possession of defendant New York Central System (referred to hereinafter as New York Central). That carrier delivered it to Clinton Builders Supply Corporation without obtaining a surrender of the outstanding order bill of lading or payment of the sight draft. The bill of lading with sight draft attached was then at a bank in Syracuse, where it had been forwarded by Northwestern National Bank of Minneapolis for collection. In May 1952 Clinton Builders Supply Corporation paid Freshmaster in full for the shipment. Freshmaster later failed, and plaintiff alleges that it has never been paid for this shipment.

This action originally was commenced against all three carriers who at one time or another had possession of this shipment. Summary judgment was granted in favor of Minneapolis, Northfield and Southern Railway Company. Rock Island and New York Central answered, denying liability to plaintiff and filing cross complaints against each other, each contending that if there was liability to plaintiff the other was solely liable. The trial court ordered judgment in favor of plaintiff against Rock Island, absolving New York Central of any liability. Rock Island thereafter moved for amended findings of fact and conclusions of law or a new trial, seeking relief against both plaintiff, on its complaint, and New York Central, on its cross complaint. All motions were denied, and this appeal followed.

Rock Island contends that plaintiff is not entitled to recover for the reason (1) that it has been paid in full for the shipment (a) by credits to a ledger account maintained between the parties which came into balance after delivery of the shipment involved; (b) by virtue of the doctrine of application of payments; (2) that the shipment was delivered to the rightful owner; and (3) that plaintiff, by its subsequent dealings, has ratified the delivery as made. Rock Island further contends that if there is liability to plaintiff New York Central alone is liable.

### PLAINTIFF'S RIGHT TO RECOVER

■ Rock Island claims that plaintiff has been paid in full for the shipment and that as a result plaintiff has suffered no loss on account of the delivery. The claim of payment is premised on a ledger account kept by plaintiff which Rock Island contends conclusively establishes that on February 2, 1953, about a year after the shipment involved was delivered, plaintiff actually owed Freshmaster $48.06. Hence, Rock Island argues, whatever losses plaintiff sustained occurred as a result of dealings by plaintiff with Freshmaster after the ledger account had come into balance. The fallacy of this argument lies in the assumption that the ledger account reflects the entire dealings of the parties. The evidence does not require such a finding, which is essential to the contentions of Rock Island.

The evidence shows that a ledger account was kept by plaintiff in

which Freshmaster was charged with freezers as they were shipped out. It included only those goods invoiced to Freshmaster. In addition to the goods actually charged to Freshmaster, other charges were made which were not shown by the ledger. As part of the whole deal, an arrangement existed between the parties under which parts and replacements of freezers, defective or otherwise, were shipped to Freshmaster or its customers on Freshmaster's order. These parts were carried on memoranda accounts and were not shown on the ledger. Freshmaster was given credit for defective parts as they were returned. When they were not returned, Freshmaster was charged according to an established price list. In addition to such transactions, Freshmaster was indebted to plaintiff for work and material on freezers in the process of manufacture. The contract between plaintiff and Freshmaster was for the manufacture of 7,200 freezers—not only those invoiced to Freshmaster, which are all that are shown on the ledger account. The evidence would sustain a finding that, at the time the ledger account shows a balance in favor of Freshmaster, Freshmaster was indebted to plaintiff in a sum in excess of $14,000 for work and material on processed accounts and in excess of $13,000 on memo parts accounts. At no time was Freshmaster paid up in full on the entire transaction.

It is obvious that, if the sight draft involved here had been paid, the ledger account would have shown a credit balance in favor of Freshmaster on February 2, 1953, in a sum equal to the balance of $48.06, which actually appears, plus the amount of the sight draft here involved, which was some over $11,000. But it does not follow that Freshmaster would have been entitled to demand payment to it of such credit balance without first taking into consideration other charges due plaintiff. The uncontradicted testimony of Robert L. Hascall, credit manager for plaintiff, with respect to the accumulated balances in the bank account was:

"* * * the account as such, when I talk about the account as Freshmaster, the sight draft procedure as outlined was set up to give us accumulated cash balances so we could off-set any possible loss."

Toward the end of their dealings and after February 2, 1953, plaintiff shipped 5 carloads of freezers to Freshmaster on trade acceptances.

254

These trade acceptances aggregated $62,361.98 and constituted nothing more than promises to pay in the future. It is the contention of Rock Island that plaintiff's loss was due to its decision to ship on trade acceptances rather than on order bills of lading with sight draft attached and not to a failure of the carriers to insist on payment of the sight draft involved here before delivery of the shipment. While on first blush there seems to be merit to this contention if the entire agreement of the parties can be broken up into segments so that each shipment is considered an entire transaction in itself, the argument is untenable when we view the entire dealings of the parties. The evidence establishes that at no time did Freshmaster owe plaintiff less than the amount of this shipment if we view the contract as an entire one. It must follow that the ledger account standing alone is not conclusive. Payment is an affirmative defense. The burden rests on the one asserting payment to establish it. The evidence here sustains the finding that plaintiff was not paid for the carload of freezers.

■ Rock Island next contends that the doctrine of application of payment establishes its defense of payment. It argues that, inasmuch as there has been no specific application by the parties, the first payment in should be credited by the court on the first charges on the account and that, when this is done, the shipment involved has been discharged. Here, again, Rock Island's argument is premised on the proposition that the ledger account reflects the entire dealings of the parties. Inasmuch as we have come to the conclusion that the ledger account was not conclusive, there is no merit to this contention. The doctrine of application of payments has no application to the dealings of the parties when the payments are viewed in their entirety. Plaintiff was entitled to be paid the amount of this sight draft and to accumulate the balance in the bank account to be applied on any indebtedness of Freshmaster that arose out of the performance of the entire agreement. In view of that situation, it matters little how payments were applied as long as Freshmaster was indebted to plaintiff in an amount in excess of the amount of the sight draft that should have been collected before delivery of this shipment.

■ Rock Island next contends that there is no liability because the goods actually were delivered to the rightful owner.

This shipment, being in interstate commerce, is governed by the Federal Bills of Lading Act, 39 Stat. 538, 49 USCA, § 81, et seq. On the face of the bill of lading the goods were shipped by Freshmaster as consignor to itself as consignee, notify Clinton Builders Supply.[1] At the beginning of the transaction, representatives of the carriers were informed that, while the goods would be shipped in the name of Freshmaster as consignor, plaintiff actually was the shipper.

■ An order bill of lading is a negotiable instrument. A shipment thereunder may not be safely delivered to the consignee by the carrier without procuring surrender of the bill of lading in the absence of an agreement by the parties to the contrary.[2] While the goods may have been delivered to the party designated by the consignor as the one entitled to receive it, the holder of the bill of lading cannot be ignored by such delivery. Plaintiff at all times was the holder of the bill of lading. The carrier clearly is liable to such holder for delivery without procuring surrender of the bill of lading, in the absence of an agreement of the parties to the contrary or such conduct on their part as would justify such delivery.[3]

Rock Island relies mainly on Banik v. Chicago, M. & St. P. Ry. Co. 147 Minn. 175, 179 N. W. 899. While it is not clear to us just what Rock Island's contention is in this respect, it would seem that it claims that, when goods are delivered to a carrier by a seller for transportation to a buyer under an order bill of lading, title passes to the buyer under our Uniform Sales Act and the carrier thereafter may deliver the goods to the buyer without procuring surrender of the order bill of lading. To so hold would be to destroy the value of an order bill of lading. It would be contrary to the Federal Bills of Lading Act as well as our own act. The Banik case does not so hold. Any decision must be read in the light of the facts upon which it is based. The facts in the Banik case are easily distinguishable from those now before us. In that case plaintiff was indebted to H. & B. Co. but was unable to pay the debt

[1] See, Asbill, *Rights of Parties and Duties of Carriers Under Order Notify Bills of Lading,* 6 Minn. L. Rev. 271; Lust, The Law of Loss and Damage Claims (3 ed.) c. 4, § 13.

[2] 39 Stat. 540, 49 USCA, § 89(c).

[3] See, Judson v. Minneapolis & St. L. R. Co. 131 Minn. 5, 154 N. W. 506.

in money. He agreed to pay the debt instead by delivery of hoop steel, which was to be sold and the proceeds applied to payment of the debt. Accordingly, H. & B. Co. mailed an order for a quantity of hoops to be shipped f. o. b. Minneapolis at a stated price upon a bill of lading in which it should be named both as consignor and consignee. Plaintiff accepted the order unconditionally, and the hoops were delivered by plaintiff to the defendant carrier for transportation to Milwaukee. Instead of a bill of lading in which H. & B. Co. was named as consignor and consignee, plaintiff received an order bill of lading in which he was named as consignee with a direction to notify H. & B. Co. When the shipment reached Milwaukee, defendant notified H. & B. Co. and, at its direction, delivered the hoops to Schlitz Brewing Company but failed to obtain a surrender or cancellation of the bill of lading. Plaintiff attached the bill of lading to a draft drawn upon H. & B. Co. and sent it through a bank for collection, but, before presentation was made, defendant had delivered the hoops to Schlitz Brewing Company. H. & B. Co. refused to honor the draft, whereupon plaintiff made a demand upon defendant and brought action to recover the value of the hoops. The trial court found that the order of H. & B. Co. and the unconditional acceptance thereof by plaintiff amounted to a sale of the hoops and that their delivery to defendant was a delivery to H. & B. Co. so that title vested in it. No settled case was submitted to this court, and we held that in view thereof this finding could not be questioned and that the presumption arising from the form of the bill of lading *was destroyed by this finding.* The conclusions of law of the trial court were that there was a contract of sale of the hoops between plaintiff and H. & B. Co.; that the delivery to defendant for transportation to Milwaukee was a delivery to H. & B. Co.; that the title and right of possession then vested in it; and that defendant had delivered the hoops to Schlitz Brewing Company pursuant to the directions of the true owner. We recognized the effect of an order bill of lading throughout the opinion but held that, under the peculiar facts of that case, H. & B. Co. became the absolute owner of the property when it was delivered to the carrier in compliance with the order of H. & B. Co. based upon its agreement with plaintiff to deliver such hoops to it in payment of an existing debt. While there is some language in the

opinion which, if taken out of context, might support the position now taken by Rock Island, the decision is not authority for the proposition now advanced when read in connection with the facts upon which it is based.

The same is true of City Nat. Bank v. El Paso & N. E. R. Co. 262 U. S. 695, 43 S. Ct. 640, 67 L. ed. 1184. The decision in that case is based largely upon the system of dealing that had developed between the parties over a period of time. We see no necessity of pointing to the distinction between that opinion and the case now before us.[4]

■ Finally on this issue, Rock Island claims that, even assuming a misdelivery by the carrier, the subsequent conduct of plaintiff amounts to a ratification of the delivery. We see no merit to this contention. From the time that plaintiff first learned that the goods had been delivered without payment of the draft attached to the order bill of lading, it did what it could to collect the amount both from the delivering carrier and Freshmaster. It is true that plaintiff did continue to do business with Freshmaster, delivering to it several carloads of freezers on trade acceptances, but at no time did it relinquish its right to be paid for the shipment involved in this litigation.

## Liability of Carriers Inter Se

■ We need not determine which carrier was initially liable to plaintiff in this case for the reason that the liability of the carriers inter se has been placed in litigation by their cross complaints against each other. It is enough to determine here who would ultimately be liable for the loss which occurred by misdelivery of the shipment.

Under the so-called Carmack Amendment (34 Stat. 593, 49 USCA, § 20[11, 12]) the shipper may look to the initial carrier for any loss occurring during the transportation of an interstate shipment.[5] The bill

---

[4]See, Pere Marquette Ry. Co. v. J. F. French & Co. 254 U. S. 538, 41 S. Ct. 195, 65 L. ed. 391; see, also, Harwood-Barley Mfg. Co. v. Illinois Cent. R. Co. 141 La. 1, 74 So. 569; Griggs v. Stoker Service Co. Inc. 229 N. C. 572, 50 S. E. (2d) 914, 15 A. L. R. (2d) 798; Foy v. Chicago, M. & St. P. Ry. Co. 63 Minn. 255, 65 N. W. 627.

[5]See, Carpenter v. United States Express Co. 120 Minn. 59, 139 N. W. 154.

of lading issued by the original carrier governs the entire transportation.[6] However, in this case the motion of the initial carrier (Northfield Railway) for summary judgment was granted by the trial court on a finding—

"* * * that the surrender of the original Order Bill of Lading issued by the Minneapolis, Northfield and Southern Railway Company, by the plaintiff through its agent, R. L. Hascall, and securing an exchange or substitute Order Bill of Lading from the Chicago, Rock Island and Pacific Railway Company wherein the destination of said shipment was changed and the Notify Party was changed constituted such a change in the contract of shipment as set forth in said Bills of Lading as to establish that the plaintiff is not entitled to relief as against the defendant Minneapolis, Northfield and Southern Railway Company."

In effect, the court held that the contract with Northfield Railway was cancelled and a new contract entered into with Rock Island. No appeal has been taken from the judgment entered pursuant to that order so we must assume for the purposes of this opinion the correctness of the decision. As a result, it must follow that a new contract came into being when the new bill of lading was issued by Rock Island and that henceforth it was the initial carrier.[7]

■ The liability of the carriers inter se presents the most difficult problem in this case. The solution of the problem lies in the determination of responsibility for the act or acts which caused the misdelivery. In passing upon that question it is necessary to relate in more detail the facts respecting the diversion of the shipment.

Originally the shipment was delivered to Northfield Railway and it issued an order bill of lading in which Freshmaster was consignor. The carriers had been advised, however, that plaintiff actually was the shipper. The shipment was consigned to *"Order of* Peerless Appliance * * * Rochester * * * New York * * * Notify Peerless Appliance * * * 1172 Dewey Avenue Rochester * * * New York." (Italics supplied.)

---

[6]Missouri, K. & T. Ry. Co. v. Ward, 244 U. S. 383, 37 S. Ct. 617, 61 L. ed. 1213.

[7]See, Louisville & N. R. Co. v. Johnson, 182 Ky. 418, 206 S. W. 638.

The freight waybill, which is the only instrument which physically accompanies the shipment, was prepared by Northfield Railway on its printed form. The shipping instruction on the waybill was as follows:

*"Order of* PEERLESS APPLIANCE
NTFY PEERLESS APPLIANCE
1172 DEWEY AVENUE" (Italics supplied.)

Two or three days after the shipment had started on its way, plaintiff received instructions from Freshmaster to divert the shipment to Clinton Builders Supply Corporation at Syracuse, New York. Plaintiff's credit manager, Robert L. Hascall, then called the Minneapolis office of Rock Island, in whose possession the car then was, and ordered the diversion pursuant to instructions he had received from Freshmaster. The original bill of lading issued by Northfield Railway was retired, and a new bill of lading was issued by Rock Island under which the shipment was consigned to *"Order of* Freshmaster Corporation * * * Notify Clinton Builders Supply Corp. * * * 549 S. Clinton St. Syracuse * * * New York." (Italics supplied.)

The shipment thus continued on an order bill of lading. The Rock Island freight agent at Minneapolis telephoned and wired the diversion instructions to its agent at Manly, Iowa, where the shipment was intercepted. Claude E. Wendt, the Rock Island yard clerk at Manly, Iowa, testified that he personally handled the diversion of this car by making handwritten alterations on the original freight waybill to show a reconsignment to:

"Freshmaster Corp
Notify Clinton Builders Supply
549 Clinton St
Syracuse New York."

The words "order of" were omitted from the name of the consignee in the waybill as so altered.

Mr. Wendt admitted that these shipping instructions which accompanied the freight car superseded the previous typewritten instructions and did not indicate that the shipment was subject to an order bill of lading and that, as far as anyone could tell from the waybill, the

shipment could have been on a straight bill of lading. He stated that if he had known that the shipment was traveling on an order bill of lading he would have written on the waybill "In Order of the Freshmaster Corporation." He further testified that the words "in order of" are crucial words in determining from a waybill whether the shipment is traveling on an order bill of lading or a straight bill of lading.

In addition to the testimony of Mr. Wendt, New York Central called as its witness Orie M. Noel, a retired freight cashier of the Minnesota Transfer Railway, who had been employed by that railway for nearly 51 years. He testified generally with respect to the procedure followed by railroads in handling order-bill-of-lading and straight-bill-of-lading shipments and the effect of instructions contained in the freight waybill. It was his testimony that the absence of the words "order of" from a waybill would indicate that the shipment was subject to a straight bill of lading. In viewing the waybill involved here, he stated that there was nothing on the waybill which would indicate that it was subject to an order bill of lading and that an agent of a railroad presented with such a situation would be justified in making delivery of the shipment as if it were traveling on a straight bill of lading.

It may be conceded that ordinarily a carrier may not deliver a shipment of goods to a party whom it is directed to notify without surrender of the bill of lading,[8] since the mere fact that such party is to be notified usually is insufficient to give it the right to such shipment in and of itself. However, in this case, there is no dispute between the consignee (Freshmaster) and the notify party (Clinton Builders Supply). Clinton Builders Supply paid Freshmaster in full for the shipment, so the case stands the same as if delivery had been made to Freshmaster. If the shipment had been made on a straight bill of lading, the carrier would have been justified in delivering to Freshmaster, the consignee, without surrender of the bill of lading. The question posed here therefore is: Is the freight bill prepared by Rock Island in such form that New York Central would be justified in assuming that the shipment was consigned on a straight bill of lading?

New York Central contends that, inasmuch as it delivered the goods

---

[8]See, 9 Am. Jur., Carriers, § 555.

according to the instructions received from Rock Island in the waybill, it is not liable to Rock Island.

The question involving the conclusiveness of a waybill in dealings between connecting carriers was argued in Victor Produce Co. v. Chicago, St. P. M. & O. Ry. Co. 135 Minn. 49, 160 N. W. 201, but was not decided for the reason that the case was not tried on the theory that the waybill absolved the connecting carrier of liability. In some other jurisdictions it has been held that when a connecting carrier transports goods in accordance with instructions communicated to it in a waybill issued by the initial carrier which are contrary to the shipper's instructions, the carrier who complies with such waybill is not liable to the initial carrier for loss which such carrier may have to pay the shipper. In Hayman v. Canadian Pac. Ry. Co. 43 Misc. 74, 75, 86 N. Y. S. 728, 729, the court said:

"* * * As a succeeding carrier never sees the bill of lading till it is surrendered and a delivery of the goods made, the waybill is a complete defense * * *."

In Chartrand v. Southern Ry. 85 S. C. 479, 482, 67 S. E. 741, 743, the court said:

"* * * The mere delivery of the goods to the next [carrier] in line is not enough to discharge the initial carrier from liability, but he must show that the delivery was accompanied with proper shipping instructions, or at least such as he received from the shipper, so that the carrier receiving them can forward them to destination. * * * '* * * if the instructions are omitted from the shipping bills the initial carrier is responsible for the failure of the next line to know of them.' "

See, also, Briggs v. Boston & Lowell R. Co. 88 Mass. (6 Allen) 246, 83 Am. D. 626.

We think that the correct rule is that, when a shipment of goods is delivered to an initial carrier to be transported over its facilities and those of other connecting carriers, it is the duty of the initial carrier to notify the connecting carriers of the method of transportation and manner of delivery which are essential to enable the connecting carrier to receive, transport, and deliver the goods according to the contract

with the shipper.[9] This includes the duty to notify the connecting carrier whether the goods are being transported on an order bill of lading or a straight bill of lading so as to apprise the terminal carrier whether the goods can be safely delivered without procuring a surrender of the bill of lading.[10]

Rock Island relies mainly on Southern Express v. T. S. C. Motor Freight Lines (5 Cir.) 200 F. (2d) 797. While there are some similarities between that case and the one now before us, there are also some distinguishing facts which we think make it inapplicable. In the first place, that case did not involve an action between the initial carrier and the terminal carrier. While we have noted above that Rock Island contends that it is a connecting carrier, it should be borne in mind that, after a diversion of this shipment, it was traveling on a bill of lading issued by Rock Island and on a freight waybill altered by it. Neither does the Southern Express case involve the question of whether the terminal carrier was liable. It seems to be conceded in the opinion that the terminal carrier was not liable. Liability was imposed upon the initial carrier, and it sought to recover from a connecting carrier for what it considered to be the negligence of the connecting carrier in preparation of an intermediate waybill. It is not clear just what was contained in the waybill, but the court did find that the waybill was in such form that it carried sufficient information on its face to apprise the carriers of the fact that the shipment was not to be delivered without surrender of the bill of lading. The trial court in the case before us found just the contrary. In attempting to apply the decision in the Southern Express case to the facts now before us we must keep in mind all the facts. Here, the words "order of" preceding the name of the consignee in the waybill as originally prepared were stricken. While it does not appear who drew lines through the words "order of," the words are stricken and, in addition to that, in the space provided for the name of the consignee upon reconsignment, the words "order of"

[9]Briggs v. Boston & Lowell R. Co. 88 Mass. (6 Allen) 246, 83 Am. D. 626; Pacific Car & Foundry Co. v. N. P. Ry. Co. 123 Wash. 98, 212 P. 159; 13 C. J. S., Carriers, § 413.

[10]See, Chicago & S. E. Ry. Co. v. Fifth Nat. Bank, 26 Ind. App. 600, 59 N. E. 43.

are completely omitted. It would seem that in view of all the facts the court was justified in holding that Rock Island was responsible for the alteration of the waybill upon a diversion of the shipment and that, as the waybill reached New York Central, it was justified in assuming that the goods were then traveling on a straight bill of lading; consequently, it should follow that Rock Island must stand the loss.

Rock Island also complains of the trial court's failure to make certain findings of fact. We have examined this claim and deem it sufficient to say that the findings are sufficient to present the material issues involved in the determination of the ultimate rights of the parties.

Affirmed.