In re HILLCREST FOODS, INC., Pure 1, Inc. et al., Debtors.

ARGUS MANAGEMENT CORPORATION, Trustee, Plaintiff,

v.

The PILLSBURY COMPANY, Defendant.

Bankruptcy Nos. 281–00098 to 281–00101 and 281–00220. Adv. No. 283–0089.

United States Bankruptcy Court, D. Maine.

May 16, 1984.

James B. Haines, Jr., Hewes, Culley & Beals, Portland, Me., for The Pillsbury Co.

James D. Poliquin, Norman & Hanson, Portland, Me., for trustee.

## MEMORANDUM OF DECISION

JAMES A. GOODMAN, Bankruptcy Judge.

On February 24, 1983, the trustee filed a complaint seeking to set aside an alleged preferential transfer from the debtor (WJM Co.) to the Pillsbury Company. The parties have stipulated to the facts, and in effect seek a summary judgment on certain threshold issues.

The debtor produces chicken feed; Pillsbury is a supplier of corn. In 1980, the parties made several contracts for the purchase and sale of corn for a total price of $51,207.88. Shipment terms were F.O.B. Toledo, Ohio. In accordance therewith, Pillsbury delivered the goods to Grand Trunk Eastern (carrier) on October 28, 1980, and made a reasonable contract for their transportation to the debtor in Lewiston, Maine. The carrier issued Pillsbury a negotiable bill of lading, *i.e.*, an order bill. The bill of lading states that "[t]he surrender of this Original ORDER Bill of Lading properly indorsed shall be required before the delivery of the property." It further states that the goods are consigned to the order of the debtor.

The goods were shipped in six railroad cars, arriving in Lewiston on November 6. Despite the fact that the debtor neither presented the bill of lading nor paid for the goods, the carrier released the goods to the debtor on November 11 and 12. At that time, the debtor presented the carrier with an order shipment bond which purported to indemnify and hold the carrier harmless against all loss, damages, liability and costs by reason of the carrier delivering goods to the debtor without surrender of proper documentation.

On November 24, Pillsbury tendered the bill of lading and draft-invoices for collection to a Lewiston bank. After notice, the debtor failed to pay, and the bill of lading and draft-invoices were returned to Pillsbury.

Pillsbury next notified the carrier to ship the goods to another customer. In turn, the carrier, who had already delivered the

goods to the debtor, demanded payment from the debtor as an alternative to proceeding upon the order shipment bond. The debtor paid Pillsbury in full for the goods on January 31, 1981 and February 6, 1981. Pillsbury then sent the bill of lading to the carrier, who released its claims against the order shipment bond. On March 2, 1981, the debtor filed its petition under chapter 11 of the Bankruptcy Code.

The parties have further stipulated that unsecured creditors will not receive a 100% dividend in distribution from the debtor's estate.

The trustee alleges that the payments totalling $51,207.88 made to Pillsbury on January 31 and February 6, 1981, constitute avoidable preferences pursuant to 11 U.S.C. § 547(b), which states:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; ... and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title,

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Pillsbury argues that it is a secured creditor, and is entitled to payment at least to the extent of the value of its security. Secondly, Pillsbury contends that section 547(b)(5) is not here proved because of the existence of the order shipment bond. Lastly, Pillsbury contends that an exception to the trustee's avoidance power is

applicable, namely section 547(c)(1), which states:

The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange. . . .

■ The trustee bears the burden of proving by a fair preponderance of the evidence every controverted element under section 547(b). *Rovzar v. Biddeford & Saco Bus Garage, Inc. (In re Saco Local Development Corp.)*, 25 B.R. 876, 878 (Bkrtcy.D.Me.1982). With respect to the fifth element (section 547(b)(5)), the Court finds that unsecured creditors would not receive a 100% dividend from this estate if the case were a chapter 7 case and if the disputed payments had not been made. Thus, to the extent that Pillsbury is an unsecured creditor, it is certain that unless the transfer is avoided, Pillsbury will receive more than it would have received if paid in a chapter 7 case as provided by the provisions of the Code. *See Rovzar v. Chemical Sales and Service Co. (In re Saco Local Development Corp.)*, 30 B.R. 862, 865–66 (Bkrtcy.D.Me.1983). Pillsbury does not challenge this conclusion, but contends that its claim was secured.

■ Pillsbury argues that it was a secured creditor under Article 2 of the Uniform Commercial Code. Section 2–505(1)(a) provides in part:

Where the seller has identified goods to the contract by or before shipment,

(a) His procurement of a negotiable bill of lading to his own order or otherwise reserves in him a security interest in the goods.

Me.Rev.Stat.Ann. tit. 11, § 2–505(1)(a) (1964).[1] In this case, Pillsbury procured a negotiable bill of lading to the debtor's order, and retained the bill of lading. The trustee concedes that the goods were identified by or before shipment. Thus, Pillsbury held a valid security interest in the goods at the time they were shipped. The trustee argues, however, that this security interest terminated long before the debtor paid for the goods. Pursuant to Me.Rev. Stat.Ann. tit. 11 § 9–113, a security interest arising under Article 2 of the U.C.C., such as Pillsbury's security interest, is not subject to certain requirements of Article 9 of the U.C.C. "so long as the debtor does not have or does not lawfully obtain possession of the goods." Because Pillsbury's security interest does not meet those requirements of Article 9, the trustee argues that it terminated once the debtor obtained possession of the goods from the carrier. While the debtor did obtain possession, the Court holds that the debtor did not *lawfully* obtain possession of the goods from the carrier at the time the goods were delivered.[2]

In determining whether the debtor lawfully obtained possession of the goods, the Court must look to the law which governed the carrier's rights and duties to deliver in this case. Because the goods were shipped across state lines, the Federal Bill of Lading Act, 49 U.S.C.A. §§ 81 *et seq.* (1951), here applies. *See Refrigerated Transport Co., Inc. v. Hernando Packing Co., Inc.,*

544 S.W.2d 613, 615 n. 1 (Tenn.1976). Section 89 of that Act states, in pertinent part:

A carrier is justified ... in delivering goods to one who is—

(a) A person lawfully entitled to the possession of the goods, or

.    .    .    .    .

(c) A person in possession of an order bill for the goods, by the terms of which the goods are deliverable to his order. . . .

The debtors never obtained possession of the order bill of lading. Thus, the carrier was justified in delivering the goods only if the debtor was lawfully entitled to their possession, a similar standard to that set forth in U.C.C. section 9–113.

■ It might be argued that the debtor was lawfully entitled to possession of the goods because the debtor had title to the goods at the time they were delivered. *See* Me.Rev.Stat.Ann. tit. 11, § 2–401(2) (1964).

An order bill of lading is a negotiable instrument. A shipment thereunder may not be safely delivered to the consignee by the carrier without procuring surrender of the bill of lading in the absence of an agreement by the parties to the contrary. While the goods may have been delivered to the party designated by the consignor as the one entitled to receive it, the holder of the bill of lading cannot be ignored by such delivery. . . . The carrier is clearly liable to such holder for

---

**1.** The contracts of sale provide that they shall be governed and construed under Minnesota law. Pursuant to Me.Rev.Stat.Ann. tit. 11, § 1–105(1) (1964), the parties may agree that the law of another state shall govern a transaction when it "bears a reasonable relation" to that state. The record before the Court fails to reveal any relation between the transactions in question and the state of Minnesota. The debtor is located in Maine. The exhibits indicate that the defendant is located in Buffalo, New York. The goods were shipped from Toledo, Ohio. Based on the record before it, the Court is compelled to conclude that the transactions in question bear no relation to Minnesota. Accordingly, to the extent that state law is applicable, the Court shall apply Maine law. (The Court notes, however, that at least with respect to applicable provisions of the Uniform Commercial Code, Maine law and Minnesota law are similar).

**2.** It is true that section 9–113 sets forth in the alternative that the debtor neither "have" nor "lawfully obtain possession of" the goods. It might be argued that even if the debtor obtained possession unlawfully, he still satisfies the first alternative in that he "has" the goods. Such an interpretation would reduce the second alternative to surplusage. Obviously upon obtaining possession of goods one can be said to "have" the goods. More likely, the alternatives refer to points in time; section 9–113 states that a security interest arising under Article 2 is subject to the provisions of Article 9 except to the extent and so long as the debtor does not have [at the time the security interest arises] or does not lawfully obtain [anytime thereafter] possession of the goods.

delivery without procuring surrender of the bill of lading, in the absence of an agreement of the parties to the contrary or such conduct on their part as would justify such delivery.

... it would seem that [the carrier] claims that, when goods are delivered to a carrier by a seller for transportation to a buyer under an order bill of lading, title passes to the buyer under our Uniform Sales Act ... and the carrier thereafter may deliver the goods to the buyer without procuring surrender of the order bill of lading. To so hold would be to destroy the value of an order bill of lading. It would be contrary to the Federal Bills of Lading Act....

*Schaeffer, Inc. v. Minneapolis, Northfield & Southern Railway Co.*, 254 Minn. 248, 94 N.W.2d 551, 556–57 (1959); *see also Griggs v. Stoker Service Co.*, 229 N.C. 572, 50 S.E.2d 914, 919 (1948). Here the Court finds neither an agreement of the parties nor conduct on their part which would justify the carrier's delivery to the debtor within the meaning of 49 U.S.C.A. § 89. Thus, the Court concludes that, within the meaning of 49 U.S.C.A. § 89, the debtor was not lawfully entitled to possession of the goods, and the carrier was not justified in delivering them.

As for U.C.C. section 9–113, it would make little sense to hold that the debtor "lawfully obtained" goods which it was not lawfully entitled to possess. Rather, under section 9–113, a "delivery to the buyer without surrender of a negotiable bill of lading covering the goods, ... would be a wrongful delivery, and the possession thus obtained would not be lawful." 3A *Benders Uniform Commercial Code Service* § 11.06 at 11–68 (1983). This result is consistent with the limited purpose of the section 2–505 security interest, namely, to secure payment by the buyer. *See* Me.Rev. Stat.Ann. tit. 11, § 2–505 comment 1 (Uniform Commercial Code Comment) (1964);

*see also* 3A *Benders Uniform Commercial Code Service* § 11.06 (1983). The Court concludes that Pillsbury did retain a security interest in the goods after delivery.

■ A seller with an Article 2 security interest has only the remedies provided by Article 2. Me.Rev.Stat.Ann. tit. 11, § 9–113(3); *Data General Corp. v. Still (In re Ault)*, 6 B.R. 58, 67 (Bkrtcy.E.D.Tenn. 1980). The seller's remedies are to be liberally administered. *See* Me.Rev.Stat.Ann. tit. 11, § 1–106(1) (1964). A seller may ordinarily look to the goods for its recovery. *See* Me.Rev.Stat.Ann. tit. 11, § 2–703(1), (4). Where, as here, the debtor's possession of the goods was wrongful, and the seller retained a security interest therein, the seller should be treated as if the goods had remained under its control or in its possession. Accordingly, Pillsbury should be entitled to at least the goods or their proceeds.[3] *See Data General Corp. v. Still (In re Ault)*, 6 B.R. at 67; *cf. Gus Z. Lancaster's Stock Yards, Inc. v. Williams*, 37 N.C.App. 698, 246 S.E.2d 823 (1978) (where buyer obtains possession of chattels in a cash sale by means of draft (for which buyer knows there are insufficient funds), and buyer then sells chattels to third party, seller is entitled to follow proceeds of the sale). *See generally* 3A *Bender's Uniform Commercial Code Service* § 11.06 (1983).

Because the Court's determination that Pillsbury retained a security interest in the goods after delivery will not necessarily defeat the trustee's preference action in whole or in part, the Court must address the remaining two issues before it.

Pillsbury next relies on the order shipment bond. The order shipment bond, procured by the debtor, indemnified the carrier for any loss it might suffer to Pillsbury on account of its delivery to the debtor. Thus, Pillsbury argues, the bond also "secured" its claim against the debtor for payment,

---

3. The parties agreed that if the Court held that a security interest continued in favor of Pillsbury after delivery of the goods to the debtor, then further evidence would be required. "The parties have not much argued the remedy question," *Data General Corp. v. Still (In re Ault)*, 6 B.R. at 67, and the Court will leave for future determination issues such as tracing, the application (if any) of Me.Rev.Stat.Ann. tit. 11, § 9–315, etc.

albeit indirectly, and should be considered the "functional equivalent of a security interest." Pillsbury concludes that because it could have recovered full payment from the carrier on the order shipment bond had the debtor filed a chapter 7 case without paying for the goods, it follows that the trustee has failed to satisfy the requirements of section 547(b)(5).

■ Pillsbury overlooks the fact that a preference action focuses on a transaction's effect *on the debtor's estate.* " 'It is its effect upon the equal distribution of the estate of the [debtor] not its effect upon the creditor, that determines the preference.' " 4 *Collier on Bankruptcy* ¶ 547.35 at 547–116 (15th ed. 1984) *quoting Swarts v. Fourth National Bank,* 117 F. 1, 7 (8th Cir.1902); *Bakst v. Atlantic National Bank (In re Kayajanian),* 27 B.R. 711, 712 (Bkrtcy.S.D.Fla.1983) (test of a preference is whether transfer will have the effect of paying one claim a larger dividend out of the debtor's estate than the estate will pay on other claims of the same class); *see also In re Santoro Excavating, Inc.,* 32 B.R. 947, 10 B.C.D. 1369 (Bkrtcy.S.D.N.Y.1983). Pillsbury concedes that the payments of $51,207.88 depleted the debtor's estate to the detriment of other creditors in the same class. That Pillsbury might have been paid the same amount by a third party had the debtor not paid does not change this fact. Pillsbury's reliance upon the order shipment bond in this proceeding is misplaced.[4]

■ The final issue to be decided is whether the payments in question fall within the contemporaneous exchange exception set forth in 11 U.S.C. § 547(c)(1). The section 547(c) defenses are affirmative defenses, and the creditor bears the burden of establishing them. *Rovzar v. Seaboard Chemicals, Inc. (In re Saco Local Devel-*

*opment Corp.),* 30 B.R. 870, 872 (Bkrtcy.D. Me.1983).

In order to qualify for the section 547(c)(1) exception, the creditor must show that the debtor and creditor intended the transfers to be contemporaneous exchanges for new value given to the debtor and that they were in fact substantially contemporaneous exchanges.

*Rovzar v. Prime Leather Finishes Co. (In re Saco Local Development Corp.),* 30 B.R. 859, 861, 10 B.C.D. 962, 963 (Bkrtcy.D. Me.1983). Here there was a delay of more than 2½ months between the transfer of the goods and payment therefor. Despite notification from the bank that Pillsbury had tendered drafts, the debtor without explanation failed to pay for the goods. In response, Pillsbury ordered a reconsignment of the goods to another customer. The record reveals no other action by the debtor or Pillsbury prior to the time payment was made, nor any explanation for the delay.[5] Pillsbury relies upon the way that the sale was structured as evidence that the parties intended a contemporaneous exchange. The debtor's actions, of course, might lead one to conclude that the debtor never intended a contemporaneous exchange. Assuming, however, that the parties did intend at the outset that the transfers would be contemporaneous exchanges for new value, the Court finds that Pillsbury has failed to prove that the exchanges were, in fact, substantially contemporaneous. *Cf. Butz v. Pingel (In re Pingel),* 17 B.R. 236, 238–39 (Bkrtcy.S.D. Ohio 1982) ("The purpose of adding the requirement [that the transfer be in fact a substantially contemporaneous exchange] is to avoid the inherent evidentiary difficulties of 11 U.S.C. § 547(c)(1)(A) by requiring that the parties' conduct bears out their alleged intentions.").

An appropriate order shall be entered.

**4.** The Court expresses no opinion as to whether Pillsbury retains any cause of action against the carrier or upon the bond.

**5.** While Pillsbury states in its memorandum of law that the debtor "attempted to make immediate payment" and that "the parties steadfastly worked toward effecting prompt payment," there is no evidence before the Court of any attempts to pay nor of any direct contact between the parties following delivery of the goods until the debtor paid for the goods.