REFRIGERATED TRANSPORT CO., INC., Appellant,

v.

HERNANDO PACKING CO., INC., Appellee.

Supreme Court of Tennessee.

Dec. 20, 1976.

Thomas A. Stroud, Goff, Sims, Cloud & Stroud, Memphis, for appellant.

Stephen H. Biller, Charles R. Krivcher, Goodman, Glazer, Strauch & Schneider, Memphis, for appellee.

## OPINION

HENRY, Justice.

This controversy between a consignor and a common carrier of property involves the carrier's liability for misdelivery of cargo transported under a straight bill of lading. The trial court found the issues against the carrier and we conclude that he reached the correct conclusion.

### I.

On January 3, 1975, Hernando Packing Company, Inc., of Memphis, shipped via Refrigerated Transport Company, Inc., a truck load of frozen meat consigned as follows:

[T]o BROWARD COLD STORAGE (acct. of J&A Trading Co.) 3220 S.W. 2nd Avenue . . . Fort Lauderdale, Florida.

Broward is a public warehouse.

Prior to making this shipment Hernando had received a call from an individual who identified himself as *Al Hark* and held himself out to be a representative of J&A Trading Company. In point of fact he had no connection with J&A Trading Company and that company had gone out of business. Hernando had never done business with Al Hark, but on one prior occasion, had shipped to J&A Trading Company pursuant to a transaction with *Joseph Hark,* its then representative and owner, and father of Al Hark.

It is fairly inferable from the record that this unfamiliarity with Al Hark prompted the precaution of making the shipment to Broward, a public warehouse, for the account of J&A. However, the record is not specific in this regard and the shipment may have been made thusly as a matter of custom in the business or trade.

On January 6, 1975, upon the arrival of Refrigerated's truck in Fort Lauderdale, it was met *across the street from Broward* by Al Hark, but within sight of Broward's manager. Without the knowledge of Hernando or reconsignment or assent of Broward, and after representing himself to Refrigerated's driver as being a representative of J&A, Al Hark caused 84 boxes, or 5,040 pounds of boneless beef to be delivered to another address. Refrigerated's driver did not contact Broward and, insofar as the record shows, delivery was made solely on the basis of the verbal representations of Al Hark.

The next morning Refrigerated's truck came to Broward's dock and was again met by Al Hark. In the sight and presence of the Broward manager, Hark directed that a part of the remaining meat be reloaded on another truck and that the balance be stored with Broward to the account of J&A. Al Hark again represented himself to be a representative of J&A. The record does not show when, to whom, or if the driver surrendered the bill of lading.

By these maneuvers, Al Hark acquired possession of 246 boxes, or 9,520 pounds of meat ranging from ribeyes to oxtails and having a stipulated value of $5,880.86.

On January 7, 1976, Joseph Hark was informed of the arrival of the meat, whereupon he called Hernando and advised that J&A was out of business; that it had placed no order; and that this was not the first time his son, Al Hark, had placed such

orders in the name of J&A. Hernando called Broward to direct that the meat not be delivered to Al Hark but was informed that delivery had already been made and without any reconsignment from Broward.

The trial judge, on this set of facts found and decreed:

That the consignee on the Straight Bill of Lading herein was Broward Cold Storage at 3220 S.W. Second Avenue, Ft. Lauderdale, Florida, and that the Defendant had an absolute duty to deliver the frozen meat involved herein to said consignee and to no other.

## II.

This controversy pivots upon the precise provisions of the bill of lading, viz: the consignment to "Broward Cold Storage (account of J&A Trading Co.)." Refrigerated earnestly insists that this, in effect, was a consignment to "J&A Trading Co., care of Broward Cold Storage." While this position is plausible, when consideration is given to the nature and purpose of bills of lading, the duties and obligations arising thereunder, and to the plain terms of the consignment, we cannot embrace this theory of the case.

At the very outset we point out that we are dealing with a "straight" bill of lading which is "[a] bill in which it is stated that the goods are consigned or destined to a specified person", 49 U.S.C. Sec. 82, which is not negotiable and must be so marked (it was in this case), 49 U.S.C. Sec. 86, as opposed to an "order" bill, 49 U.S.C. Sec. 83.[1]

Delivery under a straight bill of lading may only be made to "[a] person lawfully entitled to the possession of the goods, or (b) the consignee named" therein. 49 U.S.C. Sec. 89.

While there are various areas of potential disagreement inherent in this controversy they all boil down to a single question: Who was the consignee under the bill of lading?

■ In our view, there is no ambiguity. The consignment was to Broward. The parenthetical matter inserted simply advised the warehouse as to the identity of the ultimate receiver of the goods upon Broward's reconsignment. The only address inserted was that of Broward. Al Hark's name does not appear on the bill. It is fairly inferable that the consignment was to Broward as a precautionary measure against an unknown purchaser. Such would have been reasonable and prudent. But we need not speculate since the language was clear. There is no way that this delivery could have been properly made except to Broward and at Broward's address. Most assuredly a street corner delivery to a stranger not named in the bill and not shown by the record to have presented any credentials or authority cannot constitute valid delivery. All the driver ever had to do was to present his bill of lading to an authorized representative of Broward. The failure to do so was a breach of the contract of carriage.

■ To constitute a valid delivery, absent special circumstances, it is imperative that delivery be made to the right person, at the proper time and place and in a proper manner. This is implicit in the Contract of Carriage.[2]

It is stated in Volume 13, American Jurisprudence, 2nd, Carriers § 416 that "a carrier who delivers to an alleged agent of the consignee does so at its own peril with respect to his status as such." Cited in support of this assertion is our own case of *Dean v. Vaccaro & Co.,* 39 Tenn. 488 (1859), which is fully supportive.

Pertinent to the issue is the North Carolina case of *Griggs v. Stoker Service Co.,* 229

---

1. "Bills of lading issued by any common carrier for the transportation of goods. . . . from a place in one State to a place in another State", among others, are governed by the Federal Bills of Lading Act 49 U.S.C. Sections 81–124.

2. See Vol. 13 Am.Jur.2d, Carriers, Sec. 405 et seq., and particularly Sections 405, 406, 411 and 415.

N.C. 572, 50 S.E.2d 914 (1948), wherein the Court said:

> The duty of a common carrier is not merely to carry safely the goods entrusted to him, but also to deliver them to the party designated by the terms of the shipment, or to his order, at the place of destination. 50 S.E.2d at 919.

Another case involving misdelivery of cargo, is *Dickman v. Daniels Motor Freight,* 185 Pa.Super. 374, 138 A.2d 165 (1958), wherein the delivery was made to a business establishment having a similar name and under circumstances suggestive of fraudulent conduct by a "swindler" who placed the order. The bill of lading was directed to a definite company at a definite address. The Court said:

> A common carrier is under an absolute duty to deliver goods to the person designated in the instructions of the shipper. If it fails to follow the express instructions of the shipper in making delivery, it acts at its peril and assumes the risk of wrong delivery. 138 A.2d at 167.

In *Richardson v. Railway Express Agency, Inc.,* 258 Or. 170, 482 P.2d 176 (1971), the Court held that a carrier making a delivery to one other than the named consignee "has the burden of proof to establish the ownership and right of possession of the goods at the time of such delivery." 482 P.2d at 178. The Court indicated the settled rule to be that carriers

> . . . are held strictly to the performance of their duty to make delivery of goods at the place of destination to the person designated to receive them if he presents himself or can be found with reasonable diligence. 482 P.2d at 179.

Refrigerated makes the urgent insistence that delivery to an imposter will discharge the common carrier "if it is to the imposter that the consignor actually intends to ship." We do not fault this as a general rule of law; but, as already pointed out, the shipment, for reasons we think self-evident, was to Broward.

Refrigerated relies upon *Chicago, M., St. P. & P. R. Co. v. Flanders,* 56 F.2d 114 (8th Cir. 1932); however, there the imposter held all documentary indicia of ownership and the cattle were consigned to him.

Also relied upon is *Malvern Cold Storage Co. v. American Ry. Exp. Co.,* 206 Iowa 292, 220 N.W. 322 (1938); however, according to Refrigerated's brief filed in this Court, "[t]he circumstances were such that the consignor's actual *intention* was to deliver to [the imposter]." (Emphasis supplied).

Next we are cited to *Fulton Bag & Cotton Mills v. Hudson Navigation Co.,* 157 F. 987 (S.D.N.Y.1907). There no public warehouse was involved; identity of names was involved; due inquiry was made by the carrier prior to delivery; and proper notification was given pursuant to the bill of lading.

Other cases cited by appellee are also distinguishable.

In 54 A.L.R. at 1330, in an annotation relating to delivery to an imposter, it is stated that "the general rule places liability on a carrier for a misdelivery to an imposter of goods placed in the hands of the carrier for shipment". Among the cases cited in support of this proposition is our case of *Sword v. Young,* 89 Tenn. 126, 14 S.W. 481 (1890).

*Sword* is analogous to the instant case. One Gillenwaters ordered a brick machine under the assumed name of Magrauder, representing Magrauder to be a firm name. Upon arrival of the machine in Knoxville, Gillenwaters presented the bill of lading made in the name of Charles G. Magrauder, paid the freight and took possession of the machine.

The Court recognized the "well settled general rule that the carrier must deliver to the consignee at the place appointed", and thereafter stated:

> It can make no difference that the defendant carrier thought, because Gillenwaters had the bill of lading, that he was Charles G. Magrauder. If he was a stranger, as the proof shows him to be, it was the duty of the carrier to have required him to identify himself as the consignee or his rightfully constituted agent.

\*     \*     \*     \*     \*     \*

The consignment was to Charles G. Magrauder. That name was fixed on the machine, and it was a duty to deliver to him only, or, if he could not be discovered, to notify the consignor.

There is no difference between this case and one in which a consignment has been made to an actual person, and the goods delivered by accident, mistake, or carelessness to a cheat who represents himself as the real consignee. It is necessary in both to have proof of identity or authority to receive. 89 Tenn. at 128–29, 14 S.W. at 481.

We hold that Refrigerated breached its duty to deliver the cargo to Broward, the party designated in the bill of lading; that delivery to Al Hark was at Refrigerated's peril; that the burden of validating this delivery by establishing Al Hark's ownership and right to possession was upon Refrigerated and that it failed to carry that burden.

While we make this holding within the context of our view that Broward was the consignee, had we adopted Refrigerated's view that J&A Trading Company was the consignee, with the goods being shipped "in care of" Broward, the result would be the same. This necessarily follows from the facts that J&A was not in existence; that Al Hark had no connection with J&A; and that delivery was made to him without proper inquiry and without notice to Broward, or J&A. Had such inquiry been made and such notice given the driver would have discovered that he was dealing with an imposter.

### III.

Refrigerated counter-claimed for the unpaid freight bill in the sum of $675.00 together with interest thereon. The trial court dismissed the counter-claim, without assigning any reason therefor.

We note that the bill of lading contains the entry "FREIGHT TO BE PAID BY: J&A TRADING CO." in Miami. This may have prompted the trial judge.

The record before us is not sufficient to pass upon this portion of the controversy. The bill of lading shows that 498 boxes of meat, weighing 31,068¾ pounds were shipped. The stipulation shows that Al Hark diverted 246 boxes weighing 9,520 pounds. The remaining 252 boxes, containing 21,548 pounds were delivered to Broward.

We have no hesitancy in declaring that Refrigerated, by misdelivery of the diverted meat, breached its contract of carriage and forfeited its right to receive compensation to that extent. Superficially it would appear that Refrigerated would be entitled to recover for the carriage of that portion of the meat ultimately delivered to Broward. However, we make no holding in the latter regard; we merely recognize the considerations involved.

On remand, the trial judge will reconsider the counter-claim and enter such judgment as the facts may indicate and justice may require.

Affirmed in part and remanded.

COOPER, C. J., and FONES, BROCK and HARBISON, JJ., concur.