**AMPLE BRIGHT DEVELOPMENT, LTD., Plaintiff,**

v.

**COMIS INTERNATIONAL dba Comis Customs Brokers Co.; Frank Noah, an individual and dba Comis International, Defendants.**

**Case No. CV 11–01329 MMM (FMOx).**

United States District Court,
C.D. California.

Dec. 21, 2012.

---

Hillary Arrow Booth, Ian P. Culver, Booth LLP, Los Angeles, CA, for Plaintiff.

Thomas J. Ryu, Yalan Zheng, Kim Shapiro Park Lee & Ryu APLC, Los Angeles, CA, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARGARET M. MORROW, District Judge.

Ample Bright Development, Ltd. commenced this action on February 11, 2011 against Comis International, doing business as Comis Customs Brokers Co., and Frank Noah.[1] On May 2, 2011, defendants filed a third party complaint against Pacific Worldwide, Inc. and Pacific International Alliance, Inc. (collectively "Pacific"), seeking indemnity for any damages they were found to have caused Ample Bright.[2] On June 8, 2012, Comis and Noah accepted an offer of judgment pursuant to Rule 68 of the Federal Rules of Civil Procedure,[3] pursuant to which Pacific agreed to indemnify Comis and Noah for any sums found due to Ample Bright, and to compensate Noah and Comis for reasonable attorneys'

fees, investigation fees, and court costs.[4] The acceptance of the offer of judgment resolved any dispute between Pacific, on the one hand, and Comis and Noah, on the other. There remained for decision only defendants' dispute with Ample Bright.

That matter was tried to the court on July 10 and 11, 2012.[5] Following trial, both plaintiff and defendants filed briefs that detailed what they believed the evidence had established.[6] Having considered the evidence and the parties' arguments, the court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

### A. Background Information

1. Plaintiff Ample Bright Development Ltd. is a Chinese trading company that receives inquiries from overseas companies regarding handbag accessories and finds suitable Chinese factories to produce those accessories for the companies.[7] Peonie Kwock is the owner and director of Ample Bright.[8]

---

1. Complaint, Docket No. 1 (Feb. 11, 2011).

2. Third Party Complaint, Docket No. 9 (May 2, 2011).

3. The rule provides: "At least 14 days before the date set for trial, a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued. If, within 14 days after being served, the opposing party serves written notice accepting the offer, either party may then file the offer and notice of acceptance, plus proof of service. The clerk must then enter judgment." FED.R.CIV.PROC. 68(a).

4. Notice of Acceptance of Pacific's Rule 68 Offer of Judgment to Comis and Noah ("Offer of Judgment Acceptance") Docket No. 65 (June 8, 2012); Pacific's Rule 68 Offer of

Judgment to Comis and Noah ("Offer of Judgment"), Docket No. 64 (June 8, 2012).

5. Rough Transcript of Proceedings, Morning of July 10, 2012 ("July 10 Morning RT"); Rough Transcript of Proceedings, Afternoon of July 10, 2012 ("July 10 Afternoon RT"); Rough Transcript of Proceedings, Morning of July 11, 2012 ("July 11 Morning RT"); Rough Transcript of Proceedings, Afternoon of July 11, 2012 ("July 11 Afternoon RT").

6. Plaintiff Ample Bright Development, Ltd.'s Closing Brief ("Pl.'s Closing Brief"), Docket No. 84 (July 23, 2012); Defendants Comis International and Frank Noah's Closing Brief ("Defs.' Closing Brief"), Docket No. 87 (July 23, 2012).

7. July 10 Morning RT at 10:20:25.

8. *Id.* at 10:16–19.

2. Ample Bright works closely with a company named Fortune Enterprises, which is owned by Stephen McCarthy. Fortune serves as a conduit that links American companies wishing to purchase goods with manufacturers in China and Hong Kong.[9] Fortune uses Ample Bright to manufacture fashion accessories.[10] McCarthy introduced Ample Bright to Pacific.[11]

3. After Pacific gave Ample Bright the first of a series of purchase orders, Ample Bright looked for a Chinese company that had capacity to fill the order; eventually, it selected Alice Leather.[12] Ample Bright placed orders for handbags, wallets, iPhone cases, iPhone clutches, and similar items with Alice Leather in its own name, and was responsible for paying the factory itself.[13]

4. Pacific introduced Ample Bright to Comis International. Ample Bright had not previously used Comis as a freight forwarder or shipping agent.[14] Nor had Ample Bright used RDD Freight, which worked as Comis' agent in Hong Kong, prior to receiving the orders from Pacific.[15] Pacific directed Ample Bright to use Comis to transport the goods it had ordered.[16] Comis is a fictitious name under which Frank Noah does business.[17]

## B. Course of Dealing

5. When shipping goods overseas, it is common practice to secure the goods with an original bill of lading. The shipper gives the goods to a freight forwarder in exchange for the original bill of lading, then sends the original bill of lading to the intended recipient of the goods so that it can obtain release of the goods once they arrive at their destination.[18] Goods can also be released by telex.[19]

6. In connection with the purchase orders it received from Pacific, Ample Bright at times advised the freight forwarder when a shipment was booked that the bill of lading would be issued in the form of a telex. At other times, it authorized release of the goods by telex after a bill of lading had been issued, by surrendering the original bill of lading to the forwarder and paying a fee.[20]

7. With regard to the six shipments to Pacific at issue in this case, Ample Bright received bills of lading in Comis's name from its Hong Kong

9. July 10 Afternoon RT at 73:22–74:3.

10. *Id.* at 74:4–7.

11. *Id.* at 79:6–8.

12. July 10 Morning RT at 14:13:23–14:14.

13. *Id.* at 15:10–21.

14. *Id.* at 15:25–16:24.

15. *Id.* at 16:25–17:3–18.

16. *Id.* at 17:4–11; July 10 Afternoon RT at 27:4–6.

17. July 10 Afternoon RT at 24:14–26:16. By the time trial began, Noah had incorporated his business as Comis Global and Comis Custom Brokers. (*Id.* at 26:6–9.) At the time of the shipments in question, however, Comis was a fictitious business name under which Noah operated.

18. *Id.* at 18: 9–19:14.

19. *Id.* at 18:11–14.

20. July 10 Morning RT at 27:17–24.

agent, RDD Freight.[21] The bills of lading for the shipments at issue in this case—numbered 10082968, 10083005, 10083068, 10083164, 10083188, and 10093883—each provided: "The surrender of the original order bill of lading properly endorsed shall be required before the delivery of the property."[22] Ample Bright neither surrendered the original bill of lading nor authorized release of the goods covered by any of the six bills of lading to Pacific via telex.[23]

8. Noah acknowledged that the terms of a bill of lading must be followed.[24] Despite the language in the bills of lading, the fact that they were not surrendered, and the fact that Comis received no telex authorization to release any of the six shipments, Comis released the shipped goods to Pacific.[25] Noah's deposition testimony, which was used to impeach him at trial, suggested that this was part of a broader pattern of doing business between Comis and Pacific.[26]

9. Ample Bright was not told that Comis would not wait for its authorization before delivering the goods to Pacific.[27] It did not enter into any agreement with either Comis or Pacific that Comis could release the goods without its authorization.[28] Noah acknowledged that Ample Bright never told Comis that it could release the goods without the original bills or lading or a telex release. He also admitted that Comis did not tell Ample Bright it was releasing the goods without authorization.[29]

10. As Noah himself acknowledged, Comis had no course of dealing with Ample Bright that permitted Comis to release goods without Ample Bright's authorization, either by surrender of the original bills of lading or by telex release.[30] Rather, Comis was "instructed" by Pacific to deliver the goods as soon

21. *Id.* at 17:19–25.

22. *Id.* at 25:2–5; see also Exhs. 1–6.

23. *Id.* at 25:2–5, 38:23–39:7; July 10 Afternoon RT at 30:4–9; Exh. 67.

24. July 10 Afternoon RT at 28:14–18.

25. *Id.* at 30:4–17 ("Q. Now, isn't it true that despite the language in these bill[s] of lading[ ] that you just identified and in all of the bill[s] of lading[ ] issued by Comis International, Comis, in fact, released goods to consignees without the Telex release or without the bill of lading? A. For this six bill[s] of lading[ ], yes. Q. In fact, for more than just these six bills of lading, Comis International disregarded the language in the bill of lading and released the goods to Pacific without authorization by Ample Bright, correct? A. Yes. Q. And for these six, in particular, Comis did not receive a Telex release, correct? A. Yes. Q. Comis did not receive the original bill of lading, correct? A. Yes").

26. *Id.* at 32:19–33:1 ("Question: So you're telling me that it's your company's practice to require shippers to separately tell you to hold the goods even though your contract requires you to hold it? Answer: Not for the—not for everybody. Question: Only for Ample Bright? Answer: Only for Pacific").

27. July 10 Morning RT at 25:24–26:2.

28. *Id.* at 30:16–23.

29. July 10 Afternoon RT at 35:19–23.

30. *Id.* at 37:22–38:5 ("Q. And prior to the first unauthorized release, which was on or about July 17, Comis did not have a course of dealing or practice with Ample Bright that would have allowed for the release of goods prior to Ample Bright's authorization, correct? A. Correct. Q. In fact, Comis never had such a course of dealing with Ample Bright, correct? A. Yes"); see also *id.* at 42:12–20.

as they arrived.[31] Terzian confirmed this, stating that Pacific's "deal" with Comis was that Comis would deliver the goods to its warehouse whether or not the original bill of lading had been surrendered.[32]

## C. Damages

11. Pacific was to pay $267,635.10 for the goods at issue in this action.[33] It did not pay Ample Bright for the shipments,[34] and Ample Bright in turn has not paid Alice Leather for manufacturing the goods that comprised the shipments.[35] Ample Bright is currently a defendant in a lawsuit filed by Alice Leather in which Alice seeks to recover the amounts it is owed for the goods received by Pacific.[36]

12. In the summer of 2010, Pacific sought a chargeback (a return of funds paid) from Ample Bright, due to the fact that certain Ample Bright shipments had arrived late.[37] Kwock and McCarthy contend that Ample Bright never agreed to the chargeback.[38] They assert that instead, Ample Bright

demanded documentary support for the claimed credit before agreeing to the chargeback.[39] In contrast, Martin Terzian, the president and CEO of Pacific, and Anna Fox, Pacific's controller, testified that it was clear from their conversations with McCarthy in August 2010 that Ample Bright had agreed to a chargeback of $300,000.[40] Terzian and Fox acknowledged, however, that at the August 23, 2010 meeting at which McCarthy purportedly communicated this agreement, he requested supporting documentation for the chargeback.[41]

14. Any findings of fact that are deemed to be conclusions of law are incorporated herein as such.

## II. CONCLUSIONS OF LAW

### A. Conversion Claim

15. Ample Bright first asserts a conversion claim.[42] "Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion are the plaintiff's ownership

---

31. *Id.* at 68:25–69:1. Comis appears to have followed this pattern with respect to several of the shipments that Ample Bright telex released as well. (See Exh. 202.) Noah asserted he had been told by Pacific that it had an agreement with Ample Bright and Fortune that Pacific was to receive the goods immediately upon their arrival in Los Angeles. He stated that Martin Terzian and Anna Fox of Pacific told him that Pacific would then deliver the goods to its customer, Wal–Mart, "turn the goods into cash," and then pay Ample Bright." (July 10 Afternoon RT at 31:9–19.)

32. July 11 Morning RT at 95:22–96:3.

33. See Exhs. 7–17.

34. July 10 Morning RT at 50:20–54:18.

35. *Id.* at 54:19–21.

36. *Id.* at 55:3–9.

37. *Id.* at 44:17–23, 75:23–77:4.

38. *Id.* at 45:7–12, 78:11–15; July 11 Morning RT at 42:12–13.

39. July 10 Morning RT at 44:24–45:6, 77:20–78:5.

40. July 11 Morning RT at 85:23–86:3; July 11 Afternoon RT at 31:13–18, 33:7–10.

41. July 11 Morning RT at 87:1–18; July 11 Afternoon RT at 31:19–25 ("Q. Were there discussions at that meeting as far as providing supporting documents? A. Oh, yes, he did. Q. Mr. McCarthy requested supporting documents? A. Yes. Yes—yes").

42. Complaint, ¶¶ 22–25.

or right to possession of the property at the time of the conversion; the defendant's conversion by a wrongful act or disposition of property rights; and damages." *Farmers Ins. Exchange v. Zerin,* 53 Cal.App.4th 445, 451, 61 Cal.Rptr.2d 707 (1997) (quoting *Oakdale Village Group v. Fong,* 43 Cal.App.4th 539, 543–44, 50 Cal.Rptr.2d 810 (1996)). "Delivery to a person who is not the holder [of the bill of lading], without the holder's authorization, constitutes a conversion of the [shipped] goods and a breach of contract." *BII Finance Co. v. U–States Forwarding Services Corp.,* 95 Cal. App.4th 111, 124, 115 Cal.Rptr.2d 312 (2002).

16. As the purchaser of the goods, Ample Bright had a right to possess the property that comprised the shipments at issue in this case.

17. Each of the bills of lading for the shipments expressly provided: "The surrender of the original order bill of lading properly endorsed shall be required before the delivery of the property." Ample Bright did not surrender the original bills of lading, nor did it authorize release of the goods by telex, as it had done in the past. Nonetheless, Comis released the goods to Pacific in violation of the agreement between Comis and Ample Bright. In doing so, Comis wrongfully deprived Ample Bright of its property.

18. Defendants argue that the parties had a course of dealing that permitted Comis to release the goods to Pacific.[43] A party can waive its right to require delivery by presentation of the original bill of lading if it knowingly permits cargo to be cleared by other means. *Nebco Intern. Inc. v. M/V Nat. Integrity,* 752 F.Supp. 1207, 1222 (S.D.N.Y. 1990). The California Commercial Code provides that "a course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance." Cal. Com.Code § 1303(f), see also *id.,* § 1–303(d) (providing that a course of performance or course of dealing between the parties "is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement *or qualify the terms of the agreement*" (emphasis added)); Cal. Com.Code §§ 1303(d), 1303(f) (same). A "waiver is the intentional relinquishment or abandonment of a known right or privilege." *Smith v. Selma Community Hosp.,* 164 Cal.App.4th 1478, 1506, 80 Cal. Rptr.3d 745 (2008) (citing *In re Sheena K.;* 40 Cal.4th 875, 881 n. 1, 55 Cal.Rptr.3d 716, 153 P.3d 282 (2007)); see *Central Illinois Public Service Co. v. Atlas Minerals, Inc.,* 965 F.Supp. 1162, 1173 (C.D.Ill. 1997) (discussing waiver under the UCC and noting that "[w]aiver is not defined in the UCC, but its meaning is well established"). Under California law, moreover, delivery of goods to a person who is not the holder of a bill of lading constitutes a conversion only if the delivery is made without the authorization of the holder of the bill of lading. *BII Finance Co.,* 95 Cal. App.4th at 124, 115 Cal.Rptr.2d 312.

43. Defs.' Closing Brief at 11.

19. Ample Bright did not knowingly permit the shipments at issue to be released to Pacific. It was not aware that Comis was releasing the goods to Pacific without its authorization, either through release of the original bills of lading or by telex. As Noah himself admitted, Comis had no course of dealing with Ample Bright that permitted the conduct in which defendants engaged. Defendants argue that the parties had a common course of dealing pursuant to which Ample Bright would email shipping documents to Pacific so it could pick up the merchandise from Comis and Comis would release the goods to Pacific without receipt of the original bill of lading.[44] There was no testimony at trial, however, that Ample Bright had a practice of emailing shipping documents to Pacific once the merchandise had shipped.

20. Although defendants cite the testimony of Peonie Kwock, Stephen McCarthy, Martin Terzian and Anna Fox as support for this assertion, Kwock and McCarthy both testified that Ample Bright never agreed to Comis' release of the shipped goods absent surrender of the original bill of lading or telex release of the goods. Terzian, for his part, stated that he and McCarthy never discussed bills of lading or when the bills would be surrendered. Additionally, he conceded that McCarthy made no representations to him regarding surrender of the bills of lading.[45] Anna Fox testified that she never discussed shipment terms for the goods with Ample Bright.[46] Although she stated that she spoke with McCarthy about release of the original bills of lading,[47] and that surrender of the bills of lading was never a condition of Pacific paying for the goods,[48] this of course is not the question. Both Kwock and McCarthy acknowledged that there were occasions on which bills of lading were surrendered or goods telex released without full payment having been made by Pacific. In Kwock's and McCarthy's words, this occurred when Ample Bright was comfortable with accepting some risk of non-payment.[49]

21. The question is whether there was ever any course of dealing between Ample Bright and Comis pursuant to which Ample Bright agreed to Comis's release of goods without surrender of the original bill of lading or a telex release.[50] Fox testified that she and McCarthy spoke

---

**44.** *Id.*

**45.** July 11 Morning RT at 107:10–19. See also *id.* at 96:11–13, 21–24 (stating that he never had any discussions with McCarthy about release of the original bill of lading being required before the goods could be delivered, i.e., about the fact that there was a requirement that payment for the goods be made prior to release of the goods).

**46.** July 11 Afternoon RT at 46:23–25.

**47.** *Id.* at

**48.** *Id.* at 24:16–18.

**49.** See, e.g., July 10 Morning RT at 39:10–40:1; 68:23–69:4; 70:5–17; July 11 Morning RT at 19:4–11.

**50.** Defendants conflate release of the goods with payment, and argue that "[t]he course of dealing between Pacific and Ample Bright became elastic in that Pacific always settled the payments after the delivery of the merchandi[s]e to Pacific without releasing the original bill of lading, with reference to an open account." (Defs.' Closing Brief at 7.) While certainly there is a relationship between surrender of the original bill of lading or telex release of the goods and payment, the testimony was undisputed that on certain oc-

on certain occasions about the release of a bill of lading. She stated that she always spoke with him before requesting that Comis release a shipment, and that McCarthy assured her that there was no problem with the documents and he would make sure that Pacific got them.[51] Fox did not state that she asked McCarthy to permit Comis to release the goods before receiving the bill of lading or a telex release, and McCarthy's statement, as recounted by Fox, does not amount to an agreement by McCarthy that Comis could release the goods prior to receipt of the original bill of lading or a telex release.[52]

22. Because the evidence does not support defendants' assertion that Ample Bright and Comis had a common course of dealing pursuant to which Comis, with Ample Bright's knowledge, released shipped goods without requiring surrender of the original bill of lading or a telex

release of the goods, the court cannot find that Ample Bright waived its right to require either surrender of the bill of lading or telex release.

23. Defendants argue additionally that Ample Bright ratified their wrongful release and conversion of the goods that comprised the six shipments because, upon discovering that the goods had been delivered to Pacific, Ample Bright accepted partial payment from Pacific and agreed to extend the time within which Pacific had to pay the balance of the purchase price.[53] Defendants cite *A.D. Blowers & Co. v. Canadian Pacific Railway Co.*, 155 F. 935 (W.D.Wash.1907), in support of their argument. There, after a carrier released apples to the consignee without surrender of the bills of lading, the shipper accepted partial payment from the consignee and a promise that he would pay the balance of the purchase price in 35 days. *Id.* at 936. The court held that because the shipper had

casions, Ample Bright surrendered bills of lading and/or sent telex releases without full payment of the related invoices by Pacific. The fact that Ample Bright did so does not mean that it waived its right to control release of other shipments through surrender of the original bill of lading or telex release. It means only that with respect to particular shipments. See *Griggs v. Stoker Service Co.*, 229 N.C. 572, 580, 50 S.E.2d 914 (N.C.1948) ("Manifestly, the act of a shipper in ratifying the wrongful delivery of specified items of freight consigned under one or more bills of lading neither compels nor justifies an inference that he thereby intended to ratify other wrongful deliveries of other property transported under other bills of lading").

**51.** July 11 Afternoon RT at 25:22–26:4 *id.* at 48:6–9.

**52.** Ample Bright argues that McCarthy did not have authority to bind Ample Bright to any agreement, and notes that both Kwock and McCarthy testified he lacked such author-

ity. While, under California law, the acts of the agent cannot themselves create apparent authority, *Preis v. American Indemnity Co.*, 220 Cal.App.3d 752, 761, 269 Cal.Rptr. 617 (1990) ("Ostensible authority must be established through the acts or declarations of the principal and not the acts or declarations of the agent"), Ample Bright knew that McCarthy was communicating with Pacific on its behalf (as well as on behalf of Fortune) and permitted those communications to proceed with its apparent input and participation. "A principal is liable 'when the principal knows the agent holds himself or herself out as clothed with certain authority and remains silent.'" *NORCAL Mutual Ins. Co. v. Newton*, 84 Cal.App.4th 64, 78, 100 Cal.Rptr.2d 683 (2001) (quoting *Jacoves v. United Merchandising Corp.*, 9 Cal.App.4th 88, 103, 11 Cal. Rptr.2d 468 (1992)).

**53.** Defs.' Closing Brief at 12.

entered into an arrangement with the consignee pursuant to which it would receive full payment for the applies, it had ratified the carrier's misdelivery. *Id.* at 937–38 ("If, after the settlement made with Chipman, the defendant had sued him for possession or for the value of the apples, he could have successfully defended, upon the ground that he had made part payment, had given his note for the balance, and that the title thereby passed to him.... [P]laintiff [is] preclude[d] ... from asserting that against the defendant which it could not assert against Chipman. In other words, a defense good as between Chipman and plaintiff must be good as between plaintiff and defendant; for, if the plaintiff ratified the wrongful delivery by dealing with it as the lawful possession of Chipman, then it waived the right to recover of the defendant, for it can claim no greater liability against the defendant than against Chipman").

24. *Blowers* is distinguishable on two bases. First, Kwock testified that Pacific had not paid for the goods that comprised the six shipments at issue.[54] As respects each of the invoices that corresponded to one of the six bills of lading, she stated that Pacific had not paid "any part" or "any portion" of the invoice.[55] Pacific's own records confirm this. Exhibit 230, a summary of what Pacific had paid on various invoices for good manufactured by Alice Leather submitted by Ample Bright shows that none of the invoices associated with the six bills of lading at issue were paid.[56] The fact that Ample Bright may have received partial payments on other shipments covered by other bills of lading does not preclude it from pursuing defendants for the value of the shipments at issue here. Second, even if Ample Bright had received partial payment for one or more of the six shipments, unless it had agreed to accept that partial payment in full and complete satisfaction of Pacific's payment obligation, or accepted a promise by Pacific to pay the balance at some later time, Ample Bright retained the right to seek the balance from Comis and cannot be said to have ratified defendants' tort. See, e.g., *BII Finance Co.*, 95 Cal.App.4th at 126, 115 Cal.Rptr.2d 312 (rejecting an argument that defendant was not liable to BII for releasing goods without requiring surrender by the purchaser of original bills of lading because BII had accepted

---

**54.** July 10 Morning RT at 50:20–23.

**55.** *Id.* at 51:10–13 (invoice corresponding to bill of lading marked Exh. 6); 51:23–24 (invoice corresponding to bill of lading marked Exh. 5); 52:3–4 (invoice corresponding to bill of lading marked Exh. 4); 52:11–12, 52:22–24 (invoices corresponding to bill of lading marked Exh. 3); 53:6–8 (invoice corresponding to bill of lading marked Exh. 2); 54:16–18 (invoices invoice corresponding to bill of lading marked Exh. 1).

**56.** See July 10 Morning RT 50:28–54:10 (identifying the invoices associated with each of the six bills of lading); Exhs. 7–16 (invoices). While Exhibit 230 reflects that a portion of certain of the relevant invoices was paid, Terzian testified that the payments reflected the 10 percent amount owed to Fortune, not any portion of the 90 percent amount owed to Ample Bright. (July 11 Morning RT at 102:22–103:4; see also Exh. 230 (line items for P090095-4 (less than 10 percent payment), P090100-7 (10 percent payment), P090101-2 (10 percent payment), P090102-3 (10 percent payment)).

partial payment from the purchaser after the fact and had thus entered into an accord and satisfaction, and concluding that the carrier was responsible for the amount that remained unpaid); see also, e.g., *Schaefer, Inc. v. Minneapolis, N. & S. Ry. Co.*, 254 Minn. 248, 257, 94 N.W.2d 551 (Minn.1959) ("Rock Island claims that, even assuming a misdelivery by the carrier, the subsequent · conduct of plaintiff amounts to a ratification of the delivery. We see no merit to this contention. From the time that plaintiff first learned that the goods had been delivered without payment of the draft attached to the order bill of lading, it did what it could to collect the amount both from the delivering carrier and Freshmaster. It is true that plaintiff did continue to do business with Freshmaster, delivering to it several carloads of freezers on trade acceptances, but at no time did it relinquish its right to be paid for the shipment involved in this litigation"); *Griggs*, 229 N.C. at 580, 50 S.E.2d 914 ("the mere acceptance by the owners of payment for part of the goods delivered to the wrong person does not operate as a waiver of the wrongful delivery of the remainder"); *Kewanee Private Utilities Co. v. Norfolk Southern Railroad Co.*, 118 Va. 628, 88 S.E. 95, 97–98, 100 (1916) (reversing judgment for the defendant carrier because the check the consignee gave to shipper was not honored by the bank)l *Lester v. Delaware, L. & W.R. Co.*, 36 N.Y.S. 907 (N.Y.Sup. Ct.1895) ("The plaintiff, after the commencement of this suit against the defendant [carrier], received from [the consignee] payment for a portion of the goods claimed to have been converted by defendant; the plaintiff, as he testifies, stating at the time that a suit was pending against the defendant, and he would take the money, and apply it on his claim. The appellant claims that in taking this payment the plaintiff recognized the right of [the consignee] to receive the goods from the defendant, and so waived his claim against the defendant for the balance. Clearly, according to the plaintiff's evidence, there was no intent to waive his claim for the balance against the defendant. It should not be said as matter of law that there was any waiver, or any ratification of [the consigne's] authority to receive the goods. The defendant, by the reduction of the amount of the damages, gets all the benefit it is entitled to from the payment").

25. Defendants also argue that Ample Bright cannot recover for conversion because it suffered no damage. Specifically, defendants assert that McCarthy, on Ample Bright's behalf, accepted a $300,000 chargeback from Pacific based on goods that were delivered late.[57] As noted, the parties dispute whether Ample Bright agreed to accept the chargeback, or merely agreed in principle that it would accept the chargeback if Pacific supplied adequate supporting documentation. Whether or not Ample Bright agreed to a chargeback is relevant in that it is only entitled to recover the agreed value of the goods that comprised the six shipments at issue, less any payments received from Pacific. Viewed one way, any

---

57. Defs.' Closing Brief at 9–10.

chargeback to which Ample Bright agreed reduced the value of the goods that defendants converted. Viewed another, the amount of the chargeback was effectively a substitute for payment of that amount by Pacific.[58]

26. Ample Bright adduced evidence that it requested that Pacific provide documentation from Wal–Mart showing that the chargeback related to specific Ample Bright purchase orders, style numbers, and/or shipments. Both Kwock and McCarthy testified that because such documentation was not forthcoming, Ample Bright never agreed to the chargeback.[59] Although both Terzian and Fox testified that McCarthy agreed to a $300,000 chargeback during an August 23, 2010, meeting, both conceded that he asked for supporting documentation at that time.[60] Based on the record before the court, it cannot find that Ample Bright agreed to a $300,000 chargeback. At best, McCarthy communicated Ample Bright's conditional agreement to

the chargeback at the August 23, 2010 meeting. The condition he placed on that agreement, however, was not met—i.e., provision of backup documentation showing purchase order numbers, style numbers or shipment dates.

27. More fundamentally, it is impossible to discern from the evidence in the record whether the chargeback Pacific accepted from Wal–Mart relates to the six shipments at issue in this case. It is only if the chargeback related to those shipments, of course, that it would go to reduce the value of the goods converted by defendants and/or be equivalent to a payment by Pacific for those goods. The Wal–Mart chargeback shows an "event date" of July 22, 2010, and an "acceptance date" of July 26, 2010.[61] The six shipments at issue here had estimated departure dates (from China) of August 7 through September 25, 2010.[62] To the extent the chargeback related to other shipments, made between June and July 22, 2010,[63] and was accepted

---

**58.** Defendants also argue that Ample Bright suffered no damage because it caused Pacific to pay $48,000 for iPhone cases that it never shipped. (See July 11 Morning RT at 48:16–51:4; 80:7–16; July 11 Afternoon RT at 37:19–38:1.) The evidence is contradictory as to whether a small portion of the iPhone cases Pacific ordered were delivered. After being shown Exhibit 201, Terzian said that a "very small portion" of the order was delivered. (July 11 Morning RT at 111:20–112:11.) Anna Fox, on the other hand, said that the entry on Exhibit 201 related to a different shipment. (See July 11 Afternoon RT at 2–11.) The dispute is immaterial because defendants proffer no authority for the proposition that a plaintiff suffers no damage due to a defendant's wrongful release of goods to a third party if plaintiff owes that third party money in connection with a completely separate transaction.

**59.** See, e.g., July 10 Morning RT at 45:2–6, 46:11–47:4, 48:5–7, 56:23–57:2, 77:2–78:5; July 10 Afternoon RT at 85:15–87:10, 90:23–91:7, 92:16–25, 93:15–94:6, 104:25–105:12. See also Exhs. 217, 224.

**60.** July 11 Morning RT at 87:1–18; July 11 Afternoon RT at 31:19–25.

**61.** Exhibit 218. In fact, Terzian testified that he first discussed the chargeback with Wal–Mart in June or July 2010. (See July 11 Morning RT at 81:6–82:1.)

**62.** Exhibit 230.

**63.** Exhibit 230 reflects that these earlier shipments were paid in full by Pacific.

by Ample Bright, Ample Bright would have an affirmative obligation to pay the amount of the chargeback to Pacific. If it did not, Pacific could, of course, pursue payment through litigation.[64]

28. In sum, it is undisputed that, despite receiving the goods, Pacific did not pay Ample Bright for the shipments at issue in this case.[65] For the reasons stated, the court concludes that Ample Bright is entitled to recover from defendants on its conversion claim.

## B. Breach of Contract

29. Ample Bright also asserts a claim for breach of contract.[66] The required elements of a breach of contract claim are: (1) the existence of a contract, (2) performance by the moving party, (3) breach by the defaulting party, and (4) resulting damage to the moving party. *Great American Insurance Co. v. MIVCO Packing Co., LLC,* No. C–08–05454 RMW, 2009 WL 942390, *3 (N.D.Cal. Apr. 6, 2009) (citing *Amelco Electric v. City of Thousand Oaks,* 27 Cal.4th 228, 115 Cal.Rptr.2d 900, 38 P.3d 1120 (2002)); see also *Landstar Ranger, Inc. v. Parth Enterprises, Inc.,* 725 F.Supp.2d 916, 920 (C.D.Cal.2010).

30. The bills of lading constitute contracts between Comis and Ample Bright. See *Oak Harbor Freight Lines, Inc. v. Sears Roebuck, & Co.,* 513 F.3d 949, 954 (9th Cir.

2008) ("a bill of lading is the basic transportation contract between the shipper/consignor and the carrier, the terms and conditions of which bind the shipper and all connecting carriers"). "Delivery to a person who is not the holder, without the holder's authorization, constitutes ... a breach of contract." *BII Finance Co.,* 95 Cal.App.4th at 124, 115 Cal.Rptr.2d 312. Defendants delivered the goods at issue in this case to Pacific without Ample Bright's authorization, despite unambiguous language in the bills of lading that the goods could not be released absent surrender of the original bill of lading. The parties' course of dealing modified this requirement to permit defendants to deliver the goods to Pacific once they received a telex release from Ample Bright as well. Beyond these forms of authorization, however, Ample Bright did not waive the requirements of the contract.

31. Defendants breached the six contracts at issue by delivering the goods that comprised the shipments to Pacific without receiving either the original bill of lading or a telex release. Ample Bright fulfilled its obligations under the contract, and suffered damages by being deprived of the goods and/or their equivalent value. Consequently, defendants are liable to Ample Bright for breach of contract.

---

**64.** Defendants here cannot take advantage of any affirmative obligation Ample Bright owes to Pacific that is unrelated to the six shipments at issue in this action because that obligation does not serve to reduce the value of the goods that comprised the shipments or constitute an agreed reduction in the price of those goods (i.e., the equivalent of a partial payment by Pacific).

**65.** See July 10 Morning RT at 8:13–15 (defense counsel arguing that a chargeback was required "because of late delivery and some defects").

**66.** Complaint, ¶¶ 26–31.

## C. Negligence

32. Ample Bright next alleges a cause of action for negligence.[67] To prevail on a negligence claim, Ample Bright must demonstrate the existence of a duty, the breach of that duty, proximate cause and damages. *Artiglio v. Corning Inc.*, 18 Cal.4th 604, 614, 76 Cal.Rptr.2d 479, 957 P.2d 1313 (1998).

33. "Under general negligence principles ... a person ordinarily is obligated to exercise due care in his or her own actions so as to not to create an unreasonable risk of injury to others, and this legal duty generally is owed to the class of persons who it is reasonably foreseeable may be injured as the result of the actor's conduct." *Lugtu v. California Highway Patrol*, 26 Cal.4th 703, 716, 110 Cal.Rptr.2d 528, 28 P.3d 249 (2001). In shipping goods that were the property of Ample Bright and releasing those goods to a third party, it was reasonably foreseeable to defendants that Ample Bright might be harmed. Consequently, defendants owed Ample Bright, the holder of the original bills of lading, a duty of care. See *BII Finance Co.*, 95 Cal. App.4th at 124, 115 Cal.Rptr.2d 312 (stating that a "bailee is under a duty not to deliver the goods without surrender of the document"); see also *Johnson Products Co., Inc. v. M/V La Molinera*, 628 F.Supp. 1240, 1246 (S.D.N.Y.1986) ("The relationship between a shipper and a freight forwarder is 'fiduciary' and of 'the greatest trust and fidelity.' ICS, as the agent of Johnson Products, had a duty to take care in arranging and supervising the transport of the cargo," quoting *United States v. Ventura*, 724 F.2d 305, 311 (2d Cir.1983)).

34. Defendants breached this duty by releasing the shipments to Pacific without authorization, via surrender of the original bill of lading or telex release. This conduct caused Ample Bright's injury, as defendants' actions permitted Pacific to receive the goods without paying Ample Bright. While Ample Bright would not have been injured had Pacific paid, the risk that Pacific would not pay was foreseeable to defendants, particularly given that one purpose of a bill of lading is to ensure that payment for goods is received before they are delivered. *Cole v. Town of Los Gatos*, 205 Cal.App.4th 749, 770, 140 Cal. Rptr.3d 722 (2012) ("Under traditional tort principles, once a defendant's conduct is found to have been a cause in fact of the plaintiff's injuries, the conduct of a third party will not bar liability unless it operated as a superseding or supervening cause, so as to break the chain of legal causation between the defendant's conduct and the plaintiff's injuries. The misconduct of a third party will not ordinarily have this effect if the misconduct itself was foreseeable to the defendant" (citation and quotation marks omitted)). As detailed above, moreover, Ample Bright has adequately proved damages due to defendants' conduct.

35. Consequently, defendants are liable to Ample Bright on its negligence claim.

---

**67.** *Id.,* ¶¶ 32–34.

### D. Unclean Hands

36. Defendants argue that "Ample Bright is barred from recovery by [the] unclean hands doctrine," because it has not paid Alice for the goods at issue in this litigation and because it did not perform its obligations under the charge-back agreement.[68] Whether a claim is barred by unclean hands is a question of fact. See *Los Angeles News Service v. Tullo,* 973 F.2d 791, 799 (9th Cir.1992) ("The application of the unclean hands doctrine raises primarily a question of fact"); *Dollar Systems, Inc. v. Avcar Leasing Systems, Inc.,* 890 F.2d 165, 173 (9th Cir. 1989) (same).

37. The unclean hands doctrine bars recovery by a plaintiff (1) whose behavior is tainted by inequity or bad faith (2) that occurred in acquiring the right he now asserts. *Ellenburg v. Brockway, Inc.,* 763 F.2d 1091, 1097 (9th Cir.1985).[69] Thus, a defendant asserting that a plaintiff's claim is barred by unclean hands must show that the plaintiff acted unfairly or fraudulently respecting the matter in controversy. As the Ninth Circuit has explained,

"It is fundamental to the operation of the doctrine that the alleged misconduct by the party relate directly to the transaction concerning which the complaint is made. Unclean hands does not constitute 'misconduct in the abstract, unrelated to the claim to which it is asserted as a defense.'" *Seller Agency Council, Inc. v. Kennedy Center for Real Estate Educ., Inc.,* 621 F.3d 981, 986–87 (9th Cir.2010) (citations and quotation marks omitted). " 'The misconduct which brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made, i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants.'" *Gen-Probe,* 926 F.Supp. at 952 (*quoting Fibreboard Paper Products Corp.,* 227 Cal. App.2d at 728–29, 39 Cal.Rptr. 64); see also *Garcia v. World Sav., FSB,* 183 Cal.App.4th 1031, 1044, 107 Cal.Rptr.3d 683 (2010).

38. Defendants' reliance on the equitable doctrine of unclean hands is misplaced. As noted, whether or not Ample Bright entered into the purported chargeback agreement and whether or not it honored its obligations under any such agreement, defendants have not demonstrated that the alleged chargeback agreement relates directly to the transactions at issue in this action. While Ample Bright's failure to pay Alice Leather is more closely connected to the action, Ample Bright's failure to pay Alice does not "affect the equitable relations between the litigants," since Alice is not a party in this case. *Garcia,* 183 Cal.App.4th at 1044, 107 Cal. Rptr.3d 683. It is not inequitable to make defendants pay for goods they received from Ample Bright

---

68. Defs.' Closing Brief at 14–15.

69. An equitable defense such as unclean hands may be asserted against claims at law, including conversion. *Gen–Probe, Inc. v. Amoco Corp., Inc.,* 926 F.Supp. 948, 952 (S.D.Cal.1996) (citing *Fibreboard Paper Products Corp. v. East Bay Union of Machinists,* 227 Cal.App.2d 675, 728–29, 39 Cal.Rptr. 64 (1964); *Unilogic, Inc. v. Burroughs Corp.,* 10 Cal.App.4th 612, 621–23, 12 Cal.Rptr.2d 741 (1992)).

and improperly released to Pacific, even if Ample Bright owes a related debt to a third party. One of the reasons Ample Bright has not paid Alice Leather, in fact, is that it has not received payment for the shipments.

### E. Damages

 31. Under California law, "[f]or the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." CAL. CIV.CODE § 3333. "For the breach of an obligation arising from contract, the measure of damages ... is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." CAL. CIV.CODE § 3300.

32. Ample Bright seeks compensatory damages of $264,635.10, the amount Pacific was to pay for the goods at issue in this case.[70] This is the amount of detriment proximately caused by defendants' release of the goods without Ample Bright's authorization, which allowed Pacific to receive the goods without paying the money it owed.

33. Ample Bright additionally requests an award of punitive damages.[71] As defendants correctly note,[72]

however, Ample Bright did not seek punitive damages either in its complaint or in the final pretrial conference order.[73] As such, it has waived any right it would otherwise have had to such a recovery. FED. R.CIV.PROC. 16(e).

### III. CONCLUSION

For the reasons stated, the court concludes that Ample Bright is entitled to $264,635.10. The court will enter judgment in that amount.

---

70. Pl.'s Closing Brief at 7.

71. *Id.* at 14–16.

72. Defs.' Closing Brief at 14.

73. See Complaint at 6; Proposed Amended Final Pretrial Conference Order, Docket No. 73 (Jun. 22, 2012).